(No. 67530.—

ROBERT H. MITTELMAN, Appellee, v. JOHN J. WITOUS, Appellant.

*Opinion filed December 21, 1989.—Modified on denial of rehearing April 9, 1990.*

222

224

MILLER, J., took no part.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Thomas F. Bridgman, Paul B. O'Flaherty, Jr., Michael J.

Wagner and John M. McGarry, of counsel), for appellant.

Robert H. Mittelman, of Chicago, appellee *pro se.*

JUSTICE CALVO delivered the opinion of the court:

Plaintiff, Robert Mittelman, filed an action in the circuit court of Cook County charging defendant, John Witous, with slander *per se* and intentional, willful interference with Mittelman's "prospective business relationship and contractual expectancy" with the law firm of Clausen, Miller, Gorman, Caffrey and Witous, P.C. (Clausen Miller). Witous served on Clausen Miller's board of directors. Mittelman's first amended complaint also charged James Ferrini, another member of Clausen Miller's board of directors, with breaching a duty to Mittelman in that Ferrini failed to take reasonable steps to protect Mittelman's professional reputation, adopted Witous' statement as his own, and thereby intentionally and willfully interfered with Mittelman's prospective business relationship and contractual expectancy. Pursuant to defendant's motion to dismiss Mittelman's first amended complaint, the circuit court struck all three counts thereof as insufficient, advising Mittelman that he could move to vacate the order of dismissal within 30 days if he tendered a second amended complaint with his motion. Mittelman subsequently moved to vacate the order of dismissal and tendered a four-count second amended complaint, adding a count alleging slander *per quod.* Mittelman's motion to vacate the order of dismissal and for leave to file the second amended complaint was denied, based upon what the circuit court perceived as inadequacies in the second amended complaint. From this order, Mittelman appealed.

The appellate court, one justice dissenting, reversed the circuit court's order insofar as counts against Witous were concerned; however, the appellate court affirmed the

circuit court's order of dismissal as it pertained to the count against Ferrini. (171 Ill. App. 3d 691, 710.) Pursuant to Supreme Court Rule 315 (107 Ill. 2d R. 315), we granted Witous' petition for leave to appeal. The dismissal of Ferrini as a party is not at issue in this appeal.

As it appears the circuit court's refusal to vacate its order of dismissal and allow Mittelman to file his second amended complaint was premised upon the circuit court's belief that Mittelman's second amended complaint was insufficient as a matter of law, we will examine the pertinent allegations thereof, assuming the truth of factual allegations therein (see *Szajna v. General Motors Corp.* (1986), 115 Ill. 2d 294, 298; *Dubrovin v. Marshall Field's & Co. Employee's Credit Union* (1989), 180 Ill. App. 3d 992, 995), to determine the sufficiency of Mittelman's second amended complaint.

In January of 1979, Mittelman, an associate with Clausen Miller, was assigned by Witous, the president of Clausen Miller, to prepare for trial two cases, generally known as the Kerr-McGee cases, then pending in the circuit court of Lowndes County, Mississippi. Mittelman alleges Witous remained the attorney with ultimate responsibility for both cases.

The Kerr-McGee cases were insurance subrogation actions undertaken on behalf of the Kemper Insurance Group. The actions arose out of two separate failures of a splice in a power line which supplied electricity to a plant owned by Kerr-McGee Corporation. The original splicing was done in October of 1969. The first failure occurred in June of 1972, and was repaired within a few days; however, the splice failed again in December 1972. As a result of the splice failures, the plant lost its source of power and was rendered inoperable for the time required for repairs. Consequently, Kerr-McGee suffered a loss of profits which was covered under an insurance policy issued by Kemper.

In December 1973, both cases were referred by Kemper to Clausen Miller for evaluation of subrogation potential. In January 1974, Witous advised Kemper that the subrogation potential in both cases was excellent and that the applicable statute of limitations was six years. Witous received authorization to file suit in March of 1974. Suit was filed in the case of the June 1972 failure on June 8, 1978, in a Federal district court in Mississippi. Due to lack of complete diversity of citizenship, the complaint was dismissed in Federal court and the action was filed in the circuit court of Lowndes County, Mississippi, in July of 1978. Certain defendants in that suit raised the six-year statute of limitations as an affirmative defense. An action for the December 1972 failure was filed in the circuit court of Lowndes County in November of 1978. No defendants in that case raised the statute of limitations.

When Mittelman first reviewed the files he noted a legal memorandum from local counsel in Mississippi stating, in substance, that there was no need to worry about the statute of limitations defense interposed in the case of the June 1972 failure because a Mississippi tolling provision applied to actions removed from Federal to State court. Mittelman reviewed the statutory authority and case law cited in the memorandum and satisfied himself that the cited authorities supported the memorandum's conclusion that the statute of limitations would not be a problem.

From January 1979 until April 1982, Mittelman prepared the cases for trial, keeping Witous informed of his activities. In the course of trial preparation, considerable time and money were expended, and a settlement overture was rejected.

By April 1982, preparations for trial had been completed and Mittelman appeared in Lowndes County circuit court for pretrial conference. Defendants presented

a motion for leave to amend their answers in the case of the December 1972 failure so as to raise the statute of limitations as an affirmative defense. Defendants moved to dismiss both cases based upon a 1969 Mississippi Supreme Court decision (*M.T. Reed Construction Co. v. Jackson Plating Co.* (Miss. 1969), 222 So. 2d 838) they had recently discovered while researching another matter. Mittelman objected to the motion for leave to file the defense, arguing that the motion was untimely and that defendants had waived, or should be estopped from asserting, the defense since Kemper and Clausen Miller had expended considerable time and money in preparation for trial. The matter was set over for briefing and Mittelman returned to Chicago.

Upon his return, Mittelman advised Witous of developments in the case and presented portions of the case files for his review. Mittelman informed Witous that Mittelman had not been aware of a possible problem with the statute of limitations until presentation of defendants' motions at the pretrial conference. Further, Mittelman advised Witous, Ferrini and others that, in Mittelman's opinion, the case relied upon by defendants was directly on point. Mittelman, Witous and others prepared responses to defendants' motions; however, on September 3, 1982, the Mississippi circuit court granted defendants' motions and dismissed the Kerr-McGee cases pursuant to the *M.T. Reed* decision.

On or about September 3, 1982, Witous had a discussion with other members of Clausen Miller's board of directors concerning, generally, the firm's financial status, and specifically, a serious cash flow problem. In the course of the discussion criticism was directed at Witous for his handling of the Kerr-McGee cases, including the fact that suit was not filed for over four years after authorization was given, and the fact that dismissal on the basis of the statute of limitations would cost the firm a

considerable amount of money. At that time, Witous allegedly stated the waste of time and money in preparing the Kerr-McGee cases was not his fault, but that of Mittelman, who sat on the statute of limitations defense with knowledge of *M.T. Reed* and its applicability for three years without attempting to settle in order to cut the firm's probable losses.

In count I of his second amended complaint, Mittelman alleged the foregoing statement was "false" and Witous "knew it was false or had no reasonable basis for believing it to be true." Further, Mittelman alleged Witous' statement was made "maliciously, with an evil motive to injure [Mittelman] without just cause or excuse." Finally, Mittelman alleged that, as a result of the statement, he suffered "damage to his professional reputation."

In count II, alleging slander *per quod*, Mittelman reiterated his allegations with respect to falsity, Witous' knowledge thereof and malice. In addition, Mittelman claimed that Witous' statement caused or contributed to the decision of Clausen Miller to terminate Mittelman and, as a result, he was "injured in an amount not less than $90,000 of lost salary and income."

In count III, Mittelman alleged his employment would have been continued "but for" the statements of Witous which "caused, or contributed, to the firm's decision to terminate" Mittelman. Mittelman claimed Witous "intentionally and willfully interfered" with Mittelman's prospective business relationship and contractual expectancy "without intending thereby to further the interests of the Clausen Miller firm."

Witous first contends that Mittelman's second amended complaint is insufficient because it fails to set forth Witous' statement *"in haec verba."* Witous cites defamation cases, holding that the words alleged to be defamatory must be set forth "clearly and with particularity" (*O'Donnell v. Field Enterprises, Inc.* (1986), 145

Ill. App. 3d 1032, 1042; *Wilson v. Hunk* (1977), 51 Ill. App. 3d 1030, 1035), and cases broadly stating that "all distinctions between libel and slander have been abolished in Illinois." 171 Ill. App. 3d at 699; *Mitchell v. Peoria Journal-Star, Inc.* (1966), 76 Ill. App. 2d 154, 159-60.

Witous has waived his right to claim the statement was not alleged with sufficient particularity. Issues raised for the first time on appeal will not normally be considered by a court of review. (*Moehle v. Chrysler Motors Corp.* (1982), 93 Ill. 2d 299, 303.) As this court observed in *People v. McAdrian* (1972), 52 Ill. 2d 250, 254, the failure to urge a particular theory before the circuit court will often cause the opposing party to refrain from presenting pertinent rebuttal evidence on such theory, or, as possibly occurred in this case, caused Mittelman to refrain from rendering Witous' statement with greater specificity.

Were we to consider Witous' contention on the merits, we would nonetheless reject it. There is nothing to indicate that Witous' actual words are not set forth in Mittelman's second amended complaint. Neither failure to enclose the statement in quotation marks, nor Mittelman's use of the third person rather than the first person, result in lack of precision in the complaint.

Moreover, even if the "precise" statement is not set forth, as required by a recent appellate decision (see *Suhadolnik v. City of Springfield* (1989), 184 Ill. App. 3d 155, 187), the statement is nonconclusory, which distinguishes it from the statement at issue in *Wilson*, and the substance of the statement is readily ascertainable so as to permit judicial review of it for defamatory content. Some authorities have distinguished between a charge of libel and one of slander in the context of pleading, requiring that the defamatory words be set forth *in haec verba* in the former case, but not in the latter. (53 C.J.S.

*Libel & Slander* §133 (1987).) Such a rule makes good sense, particularly in the context of this case. Libelous material, being printed, is easier to obtain, thereby facilitating word for word duplication; whereas a defamatory statement communicated verbally to someone other than plaintiff is often difficult to reproduce verbatim, although the substance and meaning of the statement may be beyond dispute. Defendants have adequate procedural means at their disposal in the circuit court to ensure specificity in pleading (Ill. Rev. Stat. 1987, ch. 110, pars. 2—607, 2—612); therefore, where, as here, Witous did not require greater specificity below, we find Mittelman's nonconclusory, factual statement adequate to permit meaningful review.

Witous next raises several contentions concerning the "innocent construction rule," which arose from *obiter dictum* in *John v. Tribune Co.* (1962), 24 Ill. 2d 437. In *Valentine v. North American Co.* (1974), 60 Ill. 2d 168, 171, this court stated that the innocent construction rule had been "consistently applied by the appellate courts in this State." Three justices dissented in *Valentine*, disagreeing with the majority's conclusion that the statement at issue was subject to an innocent construction. (*Valentine*, 60 Ill. 2d at 172-73.) By the time of this court's decision in *Chapski v. Copley Press* (1982), 92 Ill. 2d 344, there was agreement that the rule had been applied "in something less than a completely uniform fashion" (*Chapski*, 92 Ill. 2d at 348), and the rule was modified in an effort to avoid "the inconsistencies, inequities and confusion" which were apparent from interpretations and applications of the rule. (*Chapski*, 92 Ill. 2d at 351.) There is now some question as to whether the rule can be used in deciding statements are expressions of opinion (see *Horowitz v. Baker* (1988), 168 Ill. App. 3d 603, 608) and whether the rule applies to *per quod*, as opposed to *per se*, actions (*Harris Trust & Savings*

*Bank v. Phillips* (1987), 154 Ill. App. 3d 574, 584). We will address these issues in due course, acknowledging at the inception of this discussion that the law of defamation in general—and the innocent construction rule in particular—has spawned a morass of case law in which consistency and harmony have long ago disappeared.

Witous first contends that the innocent construction rule, as modified in *Chapski*, requires all reasonable inferences at the pleading stage to be drawn in favor of the defendant. Hence, if there is any reasonably innocent construction of the statement alleged to be defamatory, that construction must be adopted. Mittelman argues dismissal of the complaint is appropriate only where the court finds an innocent construction is "equally or more reasonable" than a defamatory construction. Both parties have marshalled authority in support of their positions, none of which requires our comment.

We believe the rule, as stated in *Chapski*, is clear on this point and not susceptible of misinterpretation. We reiterate the modified rule this court announced in *Chapski*:

> "[A] written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se*." (*Chapski*, 92 Ill. 2d at 352.)

It is self-evident that a statement "reasonably" capable of a nondefamatory interpretation, given its verbal or literary context, should be so interpreted. There is no balancing of reasonable constructions as Mittelman suggests.

Of course, the modified innocent construction rule, by its terms, applies only to *per se* actions (see 53 C.J.S. *Libel & Slander* §14 (1987)): those which stand or fall upon the import of the statement, without the aid of ex-

trinsic facts, and for which damages are presumed. We perceive no good reason to extend the rule to *per quod* actions: those which are only actionable in consequence of extrinsic facts showing the circumstances under which the statements at issue were said or the damages resulting to the slandered party. (Black's Law Dictionary 1027-28 (5th ed. 1979).) Thus, appellate decisions to the contrary notwithstanding (see *Harris Trust*, 154 Ill. App. 3d at 584), a plaintiff can always seek to establish a *per quod* action in an attempt to avoid the innocent construction rule by utilization of extrinsic facts to establish the defamatory nature of a statement not otherwise facially defamatory. The whole point of a *per quod* defamation action is to establish the defamatory character of a statement otherwise innocent on its face. Extrinsic facts are not a part of *per se* analysis.

Although "related principles" have properly been applied to *per quod* actions (*Allen v. Ali* (1982), 105 Ill. App. 3d 887, 889), said principles represent a lesser standard than that embodied in the innocent construction rule. Whereas the rule pertains only to *per se* actions and requires the adoption of a nondefamatory interpretation of a statement where that construction is reasonable, the "principles" referred to in *Allen,* and utilized in subsequent decisions, require dismissal of a complaint if the words claimed to be defamatory are "not reasonably or fairly capable of the meaning assigned to them." (*American International Hospital v. Chicago Tribune Co.* (1985), 136 Ill. App. 3d 1019, 1026.) The test in *Allen* applies to all defamation suits, representing a threshold consideration in judicial analysis. If, in a *per se* action, the statement at issue is not reasonably capable of the defamatory meaning ascribed to it, there is no need to proceed to the next step and consider reasonable, nondefamatory constructions of the statement. If, in a *per quod* action, extrinsic facts are insuffi-

cient to reasonably support the defamatory meaning plaintiff urges, dismissal is in order. The rigorous standard of the modified innocent construction rule favors defendants in *per se* actions in that a nondefamatory interpretation must be adopted *if* it is *reasonable*. The tougher standard is warranted because of the presumption of damages in *per se* actions.

Before we consider Mittelman's slander *per se* count, in which he seeks presumed damages, we will first discuss certain preliminary matters that bear upon a plaintiff's right to recover presumed damages. This portion of our discussion will necessarily touch upon the requisite mental state of the defendant as affected by the context in which the statement is published. We will also review categories of words considered to be defamatory *per se* in Illinois. Thereafter, we will address factors pertaining to *any* claim of defamation, and will determine whether the statement at issue is a constitutionally protected expression of opinion, or whether it is a statement of fact which is actionable if it is false, not subject to privilege, made with the requisite mental state, and incapable of a reasonable nondefamatory construction. We will conclude our discussion with Mittelman's claim that Witous tortiously interfered with Mittelman's relationship with Clausen Miller.

Although *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997, was justifiably perceived by many to have prohibited recovery of general or presumed damages in actions based upon slander *per se*, at least where liability was not premised upon actual malice (Restatement (Second) of Torts §621, comment *b* (1977); W. Keeton, Prosser & Keeton on Torts ch. 19, §112, at 796 (5th ed. 1984); Wade, *The Communicative Torts and the First Amendment*, 48 Miss. L.J. 671, 694 (1977)), the Supreme Court limited the scope of *Gertz* in *Dun & Bradstreet, Inc. v. Greenmoss Builders,*

*Inc.* (1985), 472 U.S. 749, 86 L. Ed. 2d 593, 105 S. Ct. 2939, wherein the Court held:

> "In light of the reduced constitutional value of speech involving no matters of public concern * * * state interest adequately supports awards of presumed and punitive damages—even absent a showing of 'actual malice.' " (*Dun & Bradstreet*, 472 U.S. at 761, 86 L. Ed. 2d at 603-04, 105 S. Ct. at 2946.)

The Court thereafter determined that a credit report did not concern a public issue, as it was "speech solely in the individual interest of the speaker and its specific business audience." (*Dun & Bradstreet*, 472 U.S. at 762, 86 L. Ed. 2d at 604, 105 S. Ct. at 2946-47.) Thus, Federal authority would allow presumed damages, even absent a showing of actual malice, where no public figures or matters of public concern are involved. See also *Philadelphia Newspapers, Inc. v. Hepps* (1986), 475 U.S. 767, 774-75, 89 L. Ed. 2d 783, 791, 106 S. Ct. 1558, 1562-63.

Nonetheless, we believe Mittelman should be required to allege and prove actual malice. This court, in *Colson v. Stieg* (1982), 89 Ill. 2d 205, 209, determined that a "large area of the law concerning privileges has been taken over and altered by first amendment constitutional considerations" and "[a]s a result, the scope of the privileges in the law of defamation has been broadened beyond that within which they had previously been recognized." Specifically, this court found that the *New York Times* holding had essentially replaced the "fair comment" common law privilege. (*Colson*, 89 Ill. 2d at 210.) This court integrated the *New York Times* holding with certain preexisting common law privileges and, in so doing, made more inclusive the category of "matters of public concern" so as to include matters formerly within the purview of qualified privilege.

In *Colson*, which involved the publication of a statement to a university personnel committee charged with the responsibility of evaluating plaintiff's performance as a teacher, at least three categories of qualified privilege would have been applicable: (1) the conditional privilege which was recognized where the publisher and recipient had a common interest and the communication was of a kind reasonably calculated to protect or further it; (2) the qualified privilege which applied to communications directed to one who could act in the public interest; and (3) the privilege of "fair comment" on matters of public concern. (See W. Keeton, Prosser & Keeton on Torts ch. 19, §115, at 828-33 (5th ed. 1984).) In *Colson*, categories two and three were applicable and this court applied constitutional protection in those contexts because of the public interests concerned, even though *Gertz* would not have required it (*Colson*, 89 Ill. 2d at 216-21 (Clark, J., specially concurring, joined by Moran & Simon, JJ.)).

In the instant case, there is no public interest at stake. We are dealing here with private individuals and matters of interest only to those involved. Nevertheless, a qualified privilege is arguably applicable here, *i.e.*, common interest privilege, and we believe that actual malice must be required.

As this court noted in *Colson*, a "large area" of the law concerning privilege has been "altered" by first amendment constitutional considerations. At common law, the general rule of strict liability for defamatory communications was mitigated by application of rules concerning conditional privilege. (Restatement (Second) of Torts §600, comment *a* (1977).) As this court stated in *Zeinfeld v. Hayes Freight Lines, Inc.* (1968), 41 Ill. 2d 345, 349, the essential elements of privilege are: (1) good faith by the defendant, (2) an interest or duty to be upheld, (3) a statement limited in scope to that purpose, (4) a proper occasion, and (5) publication in a proper manner

and to proper parties only. One who could invoke the protection of conditional or qualified privilege was liable for a defamatory communication only if he did not believe the statement to be true or "lacked reasonable grounds for so believing." (Restatement of Torts §§600, 601, comment *a* (1938); *Zeinfeld*, 41 Ill. 2d at 350.) Thus, negligent publication was considered actionable.

After the Supreme Court, in *Gertz*, held that States could not impose liability without fault (*Gertz*, 418 U.S. at 347, 41 L. Ed. 2d at 809, 94 S. Ct. at 3010), the statements uttered under circumstances permitting invocation of qualified privilege stood on equal footing with statements not subject to privilege. There was, in effect, no longer a "privilege" in qualified privilege. For this reason, the Restatement suggests that "knowledge or reckless disregard as to falsity" must now be pled and proved to overcome privilege. (See Restatement (Second) of Torts §600, comments *a, b* (1977).) We adopt this position. We believe requiring a higher mental state before liability is imposed will preserve the vitality of privilege in defamation law. Aside from this court's holding in *Colson*, there remain certain areas, untouched by constitutional concerns, where privilege still has relevancy, such as private publications of defamatory statements about private individuals. (See W. Keeton, Prosser & Keeton on Torts ch. 19, §115, at 825 (5th ed. 1984).) Moreover, as Keeton observes, the common law rules regarding privilege relate to how and when a qualified privilege can be abused in a way that will subject the publisher to liability, and are not the same as those related to constitutional privilege.

Given our holding above, Mittelman must plead and prove that the statement in question was made with knowledge of its falsity or in reckless disregard of whether it was false or true. (*Colson*, 89 Ill. 2d at 212.) "Reckless disregard" has been defined as proceeding to

publish the defamatory matter despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth. (*Harte-Hanks Communications, Inc. v. Connaughton* (1989), 491 U.S. 657, ___, 105 L. Ed. 2d 562, 576, 109 S. Ct. 2678, 2685.) A legally sufficient complaint must set forth factual allegations from which actual malice may reasonably be said to exist as opposed to a bare assertion of actual malice. *Coursey v. Greater Niles Township Publishing Corp.* (1968), 40 Ill. 2d 257, 265-66; *Arlington Heights National Bank v. Arlington Heights Federal Savings & Loan Association* (1967), 37 Ill. 2d 546, 551; *American Pet Motels, Inc. v. Chicago Veterinary Medical Association* (1982), 106 Ill. App. 3d 626, 632.

In Mittelman's second amended complaint he alleged that he advised Witous, sometime after the Kerr-McGee defendants filed the motions which led to dismissal of the cases, that he had not been aware of a problem with the statute of limitations until the presentation of those motions. After setting forth the content and context of Witous' statement, Mittelman alleged that the statement was false, that Witous knew it was false or had no reasonable basis for believing it to be true, and that the statement was made maliciously and with an evil intent to injure Mittelman without just cause or excuse. Mittelman's pleadings are sufficient to allege actual malice. See *Colson*, 89 Ill. 2d at 215-16.

Having established that Mittelman has adequately alleged actual malice under both Federal and State holdings, entitling him to seek presumed damages in a *per se* action, we now outline categories of communications considered to be defamatory *per se* in Illinois.

Words are considered defamatory *per se* in Illinois if they: (1) impute the commission of a criminal offense; (2) impute infection with a loathsome communicable disease; (3) impute inability to perform or want of integrity in

the discharge of duties of office or employment; or (4) prejudice a party, or impute lack of ability, in his trade, profession or business. (*Costello v. Capital Cities Communications, Inc.* (1988), 125 Ill. 2d 402, 414; *Fried v. Jacobson* (1983), 99 Ill. 2d 24, 27; *Moore v. Streit* (1989), 181 Ill. App. 3d 587, 597.) These categories reflect similar common law exceptions to the general rule requiring special damage in defamation cases. The origin of these exceptions has been attributed to "recognition that by their nature such words were especially likely to cause pecuniary or 'temporal' *** loss." (W. Keeton, Prosser & Keeton on Torts ch. 19, §112, at 788 (5th ed. 1984).) The words themselves are considered to be so obviously and inevitably hurtful to the plaintiff that damage to his reputation may be presumed. *Zeinfeld,* 41 Ill. 2d at 348; *cf. Costello,* 125 Ill. 2d at 414; *Owen v. Carr* (1986), 113 Ill. 2d 273, 280; *Fried,* 99 Ill. 2d at 27; *Moore,* 181 Ill. App. 3d at 597.

Even if the words used could be considered defamatory under the preceding categories, they may not be actionable if they are constitutionally protected expressions of opinion. Although defamatory opinion could be actionable at common law (Restatement (Second) of Torts §566, comment *a* (1977)), the Supreme Court's opinion in *Gertz* transformed the landscape of defamation law, and the stature of opinion, when the court stated in *dicta*:

> "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact." (*Gertz,* 418 U.S. at 339-40, 41 L. Ed. 2d at 805, 94 S. Ct. at 3007.)

So began a nationwide search for a means to differentiate constitutionally protected opinion from unprotected statements of fact.

This effort by Federal and State courts to make sense out of, and implement, the views expressed in *Gertz* was not without criticism. Justice Rehnquist criticized the court of appeals' attempt in *Ollman v. Evans* (D.C. Cir. 1984), 750 F.2d 970, to formulate a workable test when he dissented from denial of *certiorari* in that case (*Ollman v. Evans* (1985), 471 U.S. 1127, 86 L. Ed. 2d 278, 105 S. Ct. 2662). Justice Rehnquist noted that lower courts had seized upon the word "opinion" in *Gertz* to "solve with a meat axe a very subtle and difficult question, totally oblivious 'of the rich and complex history of the struggle of the common law to deal with this problem.' " (471 U.S. at 1129, 86 L. Ed. 2d at 280, 105 S. Ct. at 2664.) It is indeed a testament to the difficulties inherent in the issue at hand that, when afforded the opportunity, in an analogous area of the law, to clarify the import of *Gertz* and rectify the errors of lower courts, the Supreme Court simply reiterated its prior decisions when it adopted *Hustler Magazine v. Falwell* (1988), 485 U.S. 46, 50-51, 99 L. Ed. 2d 41, 49, 108 S. Ct. 876, 879-80:

> " '[T]he freedom to speak one's mind is not only an aspect of individual liberty *** but also is essential to the common quest for truth and the vitality of society as a whole.' *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 503-504 (1984). We have therefore been particularly vigilant to ensure that individual expressions of ideas remain free from governmentally imposed sanctions. The First Amendment recognizes no such thing as a 'false' idea. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974)."

Moreover, nothing said in the *Hustler Magazine* decision would necessarily limit the broad statement in *Gertz* to a concern only for the "truth" of "political ideas" as Justice Rehnquist has indicated. (*Ollman*, 471 U.S. at 1129, 86 L. Ed. 2d at 280, 105 S. Ct. at 2663.) Indeed, it

would seem that the "freedom to speak one's mind" and thereby express one's opinion, if it is an "aspect of individual liberty," should be protected in all contexts, public and private, from liability for defamation. If there is no "such thing as a false idea," such a creature cannot exist in either the realms of public or private communications. In any event, if an idea or opinion cannot be "false," then its expression can never result in liability for slander or libel because there must be publication of matter that is both defamatory and false to create liability. (Restatement (Second) of Torts §558 (1977).) To be sure, more limited protection may justifiably be extended in the context of employment (see *Rankin v. McPherson* (1987), 483 U.S. 378, 97 L. Ed. 2d 315, 107 S. Ct. 2891; *Connick v. Myers* (1983), 461 U.S. 138, 75 L. Ed. 2d 708, 103 S. Ct. 1684); however, the rationale for circumscribing freedom in that area does not apply to the law of defamation.

Given the language employed in *Gertz* and subsequent decisions, it is not surprising that commentators and courts alike have found it necessary to formulate their own tests in an attempt to implement the protection of opinion apparently mandated by *Gertz*. In the absence of meaningful guidance from the Supreme Court, the approaches differ in design and efficacy. We deem two of them worthy of comment here.

The Restatement observes that statements of fact "usually concern the conduct or character of another" and "may consist of [allegations concerning] a particular act or omission that falls within the definition of a defamatory [statement] set forth in §559," *i.e.*, a communication that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." (Restatement (Second) of Torts §§559, 565, comment *a* (1977).) Proceeding from this simple definition of "fact,"

the Restatement then distinguishes between "pure opinion" and "mixed opinion." "Pure opinion" is used in the Restatement to denote an expression of opinion by which the maker of a comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character. If both parties to the communication know the facts or assume their existence, the maker of the comment need not himself express the alleged facts. (Restatement (Second) of Torts §566, comment *b*, at 171 (1977).) Pure opinion is to be distinguished from what the Restatement refers to as "mixed" expression of opinion, which is an opinion in form or context that is apparently based upon facts which have not been stated by the defendant or assumed to exist by the parties to the communication. (Restatement (Second) of Torts §566, at 172 (1977).) The mixed expression of opinion may give rise to the inference that there are undisclosed facts that justify the opinion expressed. If so, it is actionable.

This court has, in the past, recognized the distinction made in the Restatement and held the latter type of opinion actionable (*Catalano v. Pechous* (1980), 83 Ill. 2d 146, 162-64), as has the appellate court (*Suhadolnik*, 184 Ill. App. 3d at 186-87; *Howell v. Blecharczyck* (1984), 119 Ill. App. 3d 987, 993). Of particular interest to us here, given Mittelman's allegations in his complaint and Witous' contentions on appeal, is comment *c*(1) of section 566:

> "If the defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of false and defamatory facts, he is subject to liability for the factual statement but not for the expression of opinion." Restatement (Second) of Torts §566, comment *c*(1) (1977).

Although the framework of the Restatement in section 566 is generally acceptable, some Federal courts have found it wanting. (*Ollman*, 750 F.2d at 984-85; *Cianci v. New Times Publishing Co.* (2d Cir. 1980), 639

F.2d 54, 64-65.) Consequently, the court in *Ollman* developed its own test which proceeds under a four-part analysis to determine whether a statement implies factual allegations: (1) whether the statement has a precise core of meaning for which a consensus of understanding exists, or conversely, whether the statement is indefinite and ambiguous; (2) whether the statement is verifiable, *i.e.*, capable of being objectively characterized as true or false; (3) whether the literary context of the statement would influence the average reader's readiness to infer that a particular statement has factual content; and (4) whether the broader social context or setting in which the statement appears signals a usage as either fact or opinion. As the division of the court in *Ollman* attests (*Ollman*, 750 F.2d 970), application of the test adopted therein does not guarantee unanimity.

Since we are dealing here with semantics, we would be remiss in our review if we were to omit authorities pertaining thereto. Therefore, we note a dictionary definition of "fact" in Black's Law Dictionary:

"A thing done; an action performed or an incident transpiring; an event or circumstance; an actual occurrence; an actual happening in time space or an event mental or physical; that which has taken place." (Black's Law Dictionary 531-32 (5th ed. 1979).)

This definition seems to track the Restatement's definition of a statement of fact. Although Black's does not define "opinion" in a context relevant here, it does include a definition of "opinion evidence" which is helpful:

"Evidence of what the witness thinks, believes, or infers in regard to facts in dispute, as distinguished from his personal knowledge of the facts themselves." Black's Law Dictionary 985 (5th ed. 1979).

While the test devised in *Ollman* represents a decided advancement over the Restatement in that *Ollman* offers workable criteria for determining the existence of

undisclosed fact in a statement alleged to be defamatory, underscores precision and verifiability in distinguishing fact from opinion, and justifiably puts more emphasis on the context of the statement in determining whether the statement is meant to imply factual allegations, we see no reason to discard the Restatement's approach entirely. We find particularly meritorious the Restatement's emphasis on disclosure of fact. Meaningful interchange of ideas and the advancement of knowledge can only be accomplished if the factual basis behind an idea is disclosed. Expression of an idea without supplying the facts behind its formulation is essentially allegation without argument and proof. We are not oblivious of the need for constitutional protection safeguarding the expression of ideas and opinions; however, the expression of ideas and opinions cannot replace meaningful analysis as a means of furthering knowledge and understanding. For these reasons, we adopt the *Ollman* test to supplement, rather than replace, the analytical framework of the Restatement. We also believe the dictionary definitions we have cited will be helpful in addressing the admittedly troublesome opinion/fact dichotomy.

We turn now to the substance of Witous' contentions concerning Mittelman's defamation counts. Witous contends that his alleged statement could be construed as a legitimate expression of opinion regarding Mittelman's handling of the case and that the statement is reasonably capable of an innocent construction. According to Witous, his statement was nothing more than a negative evaluation of Mittelman's strategic approach to the case. Witous argues that, even in its most pejorative sense, the statement was not beyond the bounds of critical commentary to which every attorney is subjected from time to time. To charge an attorney with "fault" in losing a lawsuit is not, he concludes, defamation.

Initially, we note that the court in *Spelson v. CBS, Inc.* (N.D. Ill. 1984), 581 F. Supp. 1195, 1202, stated the correct relationship between the innocent construction rule and protected opinion:

> "[U]nlike statements, the meanings of which may be innocently construed or which may be interpreted as relating to someone other than plaintiff, statements of opinion are *never* actionable, even if special damages are alleged." (Emphasis in original.)

We will first analyze Witous' statement to determine whether it, or any part thereof, should be considered opinion. We reiterate the statement and its context for purposes of analysis.

The factual and verbal context provided by Mittelman is that a discussion of Clausen Miller's financial condition took place involving the board of directors of the firm, during the course of which Witous was criticized for the firm's losses in the Kerr-McGee cases. Witous responded by stating that the waste of time and money in preparing the cases was not his fault but that of Mittelman, who sat on the statute of limitations defense with knowledge of *M.T. Reed* (dispositive adverse authority) and its applicability for three years without attempting to settle or cut the firm's probable losses.

There is no question that, with the exception of the term "fault," Witous' statement was clearly a statement of fact. Although "sat" might be considered loose usage, we believe it has a precise core of meaning for which a consensus of understanding exists given this context (*Ollman*, 750 F.2d at 979), *i.e.*, to delay action or decision concerning something (Webster's Third New International Dictionary 2128 (1981)). With the exception of the term "fault," Witous' statement refers to acts and omissions (see Restatement (Second) of Torts §565, comment *a* (1977)) of Mittelman with respect to events, men-

tal or physical, that had taken place (see Black's Law Dictionary 531-32 (5th ed. 1979)).

Determining whether Witous used "fault" as a statement of fact, or as opinion, is more difficult. The term does have a fairly precise core of meaning. (*Ollman*, 750 F.2d at 979.) Black's Law Dictionary defines "fault" as:

> "Negligence; an error or defect of judgment or of conduct; any deviation from prudence, duty, or rectitude; any shortcoming, or neglect of care or performance resulting from inattention, incapacity or perversity; a wrong tendency, course, or act; bad faith or mismanagement; neglect of duty. [Citation.]
>
> The word 'fault' connotes an act to which blame, censure, impropriety, shortcoming or culpability attaches. [Citation.]" (Black's Law Dictionary 548 (5th ed. 1979).)

However, rather than referring specifically to an action or event, "fault" is generally used to characterize an event which has taken place. In a lawsuit it is a conclusion which the trier of fact may or may not draw after hearing testimony regarding facts. When considered in context, as required by the third and fourth prongs of the *Ollman* test, Witous' use of "fault" appears to be opinion in reference to stated facts, the situation to which the Restatement refers in section 566, comment *c*(1) (Restatement (Second) of Torts §566, comment *c*(1) (1977)). Although we might conclude otherwise if supporting facts had not been stated, or if the charge had been made in a different context, we believe Witous used the term "fault" to express an opinion.

Notwithstanding that conclusion, the remainder of Witous' statement is factual and we find, as did the appellate court (171 Ill. App. 3d at 701), that statement "cannot be interpreted as other than *** a charge of professional negligence on plaintiff's part." Witous charged that Mittelman was aware of dispositive adverse authority, pertaining to the statute of limitations de-

fense, and yet did nothing to settle the case in order to cut the firm's losses. The clear implication of the statement is that the statute of limitations defense had been asserted and Mittelman did nothing in response but await dismissal of the cases. Under those circumstances, Witous' allegations charged Mittelman with "[t]he omission to do something which a reasonable man" would have done (Black's Law Dictionary 930 (5th ed. 1979) (defining "negligence")) and the failure "to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly *** exercise" in such matters (Black's Law Dictionary 864 (5th ed. 1979) (defining "legal malpractice")). We believe such charges would prejudice an attorney in his profession (*Fried*, 99 Ill. 2d at 27) and should be considered "inevitably hurtful" so that damage is presumed (*Costello*, 125 Ill. 2d at 414).

The fact that Witous' criticism related only to a particular instance of Mittelman's conduct does not alter our decision. The view of the Restatement (Restatement (Second) of Torts §573, comment *d* (1977)) of a now-discredited line of Illinois appellate court decisions (*Britton v. Winfield Public Library* (1981), 101 Ill. App. 3d 546; *Delis v. Sepsis* (1972), 9 Ill. App. 3d 217; *Wade v. Sterling Gazette Co.* (1965), 56 Ill. App. 2d 101), and of a Federal case purporting to apply Illinois law (*Quilici v. Second Amendment Foundation* (7th Cir. 1985), 769 F.2d 414), was that criticism of an individual's conduct only in a particular instance was nonactionable. In *Costello*, we rejected this reasoning. (*Costello*, 125 Ill. 2d at 416.) Obviously, a charge that someone lied to his constituency or mishandled an important case could have devastating consequences for the person so maligned. To say that such a charge does not reflect adversely upon that person's character or ability is to ignore reality.

In order to dispose of Witous' claim that his statement could reasonably be innocently construed as a neg-

ative evaluation of Mittelman's strategic approach to the case, we need only refer to the verbal exchange in which the statement was made. The fact that Witous, who was allegedly under fire himself for the handling of the Kerr-McGee cases, chose that moment to "evaluate" Mittelman's conduct and attribute "fault" to him belies Witous' claim that he was speaking merely of a strategy that went awry. "Fault," as we have already noted, is a synonym for "negligence" when used in a legal context. Although we have previously determined that "fault" is an unactionable expression of opinion, nothing in *Chapski*, or any subsequent decision, requires that we ignore the verbal or literary context in which statements of fact are made. We find no innocent, nondefamatory construction exists for Witous' alleged statement.

We decline, as did the appellate court (171 Ill. App. 3d at 706), Witous' invitation to consider prior decisions for purposes of factual comparison. Given the diverse circumstances to be found in each case, the time spent in such an analysis would be substantial and the benefit to be derived meager. We have taken a significant amount of time and space in the course of this opinion in an effort to provide some guidance in this area of the law. We see no good reason to further lengthen this opinion by dissecting other decisions.

We now turn briefly to Witous' claim that he was possessed of a qualified privilege to make his statement. We have previously touched upon this subject in our discussion of the mental state which must be alleged in a defamation action in order to recover presumed damages. As we found then, Mittelman has adequately alleged actual malice which is sufficient, at this stage of the proceedings, to overcome a claim of qualified privilege.

We believe the circuit court erred when it found Mittelman's second amended complaint insufficient to state

a cause of action in defamation. We find counts I and II of the second amended complaint viable.

Witous' final contention is that there can be no claim against him for tortious interference with Mittelman's contract because Witous was not a "third party" to Mittelman's employment contract with the corporation, and because qualified privilege bars liability for tortious interference. Witous' contentions are based upon his status as a corporate officer.

A corporate officer may, for a proper business purpose and in good faith, influence the actions of the corporation. (*Swager v. Couri* (1979), 77 Ill. 2d 173, 189-90; *H.F. Philipsborn & Co. v. Suson* (1975), 59 Ill. 2d 465, 474; *Langer v. Becker* (1988), 176 Ill. App. 3d 745, 754.) This qualified privilege does not apply where officers act *solely* for their own gain or *solely* for the purpose of harming plaintiff since such conduct is not undertaken to further the corporation's interest. (*HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.* (1989), 131 Ill. 2d 145.) To be tortious, a corporate officer's action must be done without justification or maliciously. *H.F. Philipsborn & Co.*, 59 Ill. 2d at 474.

A corporate officer generally acts within the scope of one or more of four categories set forth in the Restatement: one who has a financial interest in the business affected, one who is responsible for the welfare of another, one who acts with respect to another's business policy, or one who offers advice relevant to a request. (Restatement (Second) of Torts §§769 through 772 (1977).) Sections 769 through 771 require that the actor not employ wrongful means, with section 770 additionally requiring that the action be undertaken to protect the welfare of the person or entity for whom the actor acts. (Restatement (Second) of Torts §§769 through 771 (1977).) Section 772 requires the provision of truthful information or honest advice within the scope of the request. (Restate-

ment (Second) of Torts §772 (1977).) Under the law as stated, Mittelman's allegations are sufficient to state a cause of action for tortious interference with his business relationship with Clausen Miller, notwithstanding Witous' status as a corporate officer.

It can be inferred from the facts alleged by Mittelman that Witous sacrificed Mittelman as a scapegoat in the Kerr-McGee debacle. It appears to us from the allegations of the second amended complaint that both parties may have been responsible in part for the firm's losses: Witous waited too long to file the actions and, perhaps, was remiss in his duties as supervising attorney who, Mittelman claims, was ultimately responsible for disposition of the case; on the other hand Mittelman, depending upon the scope of the research he was ordered to pursue, may have been negligent in his research, relying too much upon the assurances of local counsel. In any event, it is clear that Witous had a personal stake in the matter—preservation of his own reputation—which may very well have conflicted with the best interests of the firm.

We have already held that Mittelman has sufficiently alleged malice which is adequate, if proven, to overcome the privilege Witous invokes; we further find that Witous' statement was, *under the facts alleged,* contrary to the best interest of the corporation. It is certainly not in the best interest of the corporation to receive false information regarding one of its employees, even if that employee is ultimately responsible for a major corporate loss; nor is it in the best interest of the corporation for one who is responsible for such a loss to vindicate himself by unjustly imputing fault to another. If Witous failed to act in the corporate interest, he cannot reasonably claim that he acted on behalf of the corporation. Thus, he and the corporation are not one and the same for purposes of tortious interference analysis.

Moreover, given the allegations of Mittelman's complaint, Witous employed "wrongful means" in dealing with the corporation and Mittelman. The defamation and tortious interference counts are analytically intertwined in our view. Defamatory statements may, in themselves, give rise to a cause of action for libel or slander and, at the same time, become the means by which the tortious interference with contractual relationships or prospective economic advantage is committed. (*Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.* (1973), 16 Ill. App. 3d 709, 714.) If Witous slandered Mittelman, and ultimately cost Mittelman his job, as Mittelman alleges in his *per quod* count, that independent wrong constituted "wrongful means" within the meaning of the Restatement and, if Witous is found to have possessed the requisite intent (see Restatement (Second) of Torts §8A (1965); §766B, comment *d*, at 22 (1977)), he improperly interfered with Mittelman's prospective business relationship. (Restatement (Second) of Torts §§769 through 771 (1977).) We hold that Mittelman's second amended complaint states a cause of action for tortious interference with a prospective business relationship.

We must emphasize, before concluding, that the standard of review has compelled us to assume the truth of that which Mittelman has alleged. We note that the facts alleged are still subject to proof at trial and may well be disproved or be incapable of proof. Nevertheless, we believe the circuit court erred when it found Mittelman's second amended complaint inadequate with respect to the counts herein discussed and for that reason, we affirm the appellate court.

*Appellate court affirmed.*

JUSTICE MILLER took no part in the consideration or decision of this case.