WILLIAM J. HARTE, Plaintiff-Appellant, v. CHICAGO COUNCIL OF LAWYERS *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—90—2742

Opinion filed October 4, 1991.

LaPORTA, J., dissenting.

William J. Harte, Ltd., of Chicago, for appellant.

Schiff, Hardin & Waite, of Chicago (Frederick J. Sperling and Aphrodite Kokolis, of counsel), for appellees.

PRESIDING JUSTICE RAKOWSKI delivered the opinion of the court:

Plaintiff-appellant William J. Harte appeals from the dismissal of his complaint alleging defamation *per se* and false-light invasion

of privacy against defendants-appellees Chicago Council of Lawyers and Jeffrey B. Gilbert (Chicago Council and Gilbert, respectively). The trial court dismissed plaintiff's initial complaint, giving plaintiff leave to replead a defamation *per quod* action. Subsequently, plaintiff filed a motion to reconsider, or alternatively, sought leave to file a proposed amended complaint which again attempted to state the causes of action of defamation *per se* and invasion of privacy. Plaintiff appeals the trial court's denial of this motion and the denial of leave to file the amended complaint. We affirm.

Plaintiff's proposed amended complaint alleged the following. Plaintiff is an attorney practicing law principally in Chicago, Illinois. Defendants Chicago Council and Gilbert were an Illinois bar association and its president, respectively, at the time of the pertinent publications which give rise to this suit. On February 6, 1990, defendants published a report which related to judicial candidates for the upcoming Illinois Supreme Court election.

Plaintiff alleged that in the report, which was attached to the amended complaint, defendants falsely stated:

"Moreover, with regard to disciplining attorneys implicated in Operation Greylord, the Supreme Court has treated less prominent attorneys far more harshly than prominent ones with similar ethical lapses. This leads to the appearance that who you are or who you know may be more important to the result in the Supreme Court than the merits of the case itself."

The amended complaint further alleged that contemporaneously with the publication of the written report, defendants, through defendant Gilbert, were interviewed by members of the press. Gilbert told a reporter from the Chicago Sun-Times that "[o]ne example of alleged favoritism in Greylord cases involved several prominent lawyers who each gave $1,000 to convicted Circuit Judge Richard LeFevour." An article attributing that statement to Gilbert was published in the Sun-Times on February 9, 1990. (This article, too, was attached to the proposed amended complaint.) Plaintiff alleged on information and belief that defendant Gilbert specifically identified plaintiff as one of the persons implicated in Greylord cases to the author of the article.

Operation Greylord was a highly publicized Federal investigation and series of criminal charges relating to instances of corruption by members of the Illinois bar and bench. As a result of the publicity attendant to Operation Greylord, numerous groups, including defendants, have discussed ways to improve the Illinois court

system. Defendants have used Operation Greylord as a forum to advocate their views on reform of the Illinois judicial system. In connection with the then-upcoming election and in an effort to advocate their views on judicial reform, defendants published their report.

Chicago Council was given leave by the Illinois Supreme Court to appear as *amicus curiae* in a number of attorney discipline cases prosecuted by the Administrator of the Attorney Registration and Disciplinary Commission (ARDC). Among the cases which the ARDC prosecuted was *In re Corboy* (1988), 124 Ill. 2d 29, 528 N.E.2d 694. Among the attorneys whose cases were decided in this case was plaintiff. Plaintiff alleged that as *amicus curiae* in his case, Chicago Council and Gilbert knew of the charges brought against plaintiff, knew of plaintiff's testimony, and that defendants knew that plaintiff was not "implicated" in Operation Greylord. Defendants also knew, plaintiff alleged, that plaintiff had never been the target of a Federal investigation into criminal wrongdoing and that plaintiff had not been identified in any Greylord case as having engaged in wrongdoing or criminal activity. Defendants knew that plaintiff served as attorney to James LeFevour, originally a target of investigation and a key government witness, and that plaintiff's involvement in Operation Greylord was limited to his capacity as an attorney. Plaintiff further alleged that he contacted the then-United States Attorney and an assistant United States Attorney, and inquired whether he had been implicated in the investigation. Plaintiff was assured that he was not and that his name had not surfaced in connection with suggestion of wrongdoing.

Cook County Circuit Court Judge Richard LeFevour was indicted as a result of Operation Greylord. During Judge LeFevour's trial, evidence was introduced which established that LeFevour received a check, signed by plaintiff, in the amount of $1,000. In the amended complaint, plaintiff related the circumstances in which the check was given to LeFevour. The disciplinary proceeding brought against plaintiff established that plaintiff was informed in a brief conversation with Walter Ketchum that LeFevour's mother was hospitalized and sought release from the hospital during the holiday season. She was concerned that because of her inability to satisfy her health care obligations, she might not be readmitted to the hospital after the holidays. Plaintiff was asked to lend $1,000 to Mrs. LeFevour to satisfy her health care obligations until her insurance could provide reimbursement, and plaintiff agreed to do so. Plain-

tiff's best friend is Raymond LeFevour, Richard LeFevour's cousin. Plaintiff has known the LeFevours since the 1950's.

Because LeFevour's mother was at the time incompetent, the check was made payable to Richard LeFevour, who was acting as the conservator of his mother's estate. Plaintiff did not intend in the transaction to convey a thing of value to Richard LeFevour or to interfere with the administration of justice, and defendants knew this. Defendants also knew the facts surrounding the transaction. While Mrs. LeFevour's hospital expenses were ultimately reimbursed by her insurance carriers, the $1,000 loan was never repaid to plaintiff.

Plaintiff's amended complaint further elaborated on the disciplinary proceedings before the supreme court. Walter M. Ketchum was also a party to this proceeding. The ARDC's Administrator recommended a harsher sanction against Ketchum than against plaintiff. Chicago Council, in its capacity as *amicus curiae*, did not address the differing levels of discipline recommended and acknowledged that "mitigating factors may be present in certain of [the specific] cases." A copy of Chicago Council's brief in the disciplinary case was attached to the proposed amended complaint. Plaintiff alleged that defendants thus knew that the different sanctions imposed in his case were not the result of favoritism exhibited by the Illinois Supreme Court and that the attorneys in that case did not engage in conduct which constituted similar ethical lapses.

Defendants moved pursuant to section 2—615 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—615) to dismiss the original complaint. Defendants asserted several grounds for dismissal, including: substantial truth (which the trial court denied due to the impropriety of the defense being asserted by way of a section 2—615 motion); that the allegedly defamatory words could be innocently construed; and that the complained-of defamation could not be *per se* defamation given that it was not alleged that defendants specifically named plaintiff. The trial judge granted the motion on both of these latter grounds. The amended complaint, as indicated, alleges that Gilbert referred to plaintiff by name when being interviewed by the Sun-Times reporter.

■■ ■ The pivotal issue before this court is whether plaintiff's proposed amended complaint states a cause of action for *per se* defamation. Defamatory statements may be actionable *per se* or actionable *per quod*. A publication is actionable *per se* if it is "so obviously and naturally harmful to the person to whom it refers that a showing of special damages is unnecessary." (*Owen v. Carr* (1986),

113 Ill. 2d 273, 277, 497 N.E.2d 1145.) The defamatory character of such a statement is apparent on its face, and extrinsic facts are not necessary to explain. (*Schaffer v. Zekman* (1990), 196 Ill. App. 3d 727, 731, 554 N.E.2d 988, citing *Brown & Williamson Tobacco Corp. v. Jacobson* (7th Cir. 1983), 713 F.2d 262, 267.) Statements are actionable *per quod* if they necessitate extrinsic facts or innuendo to explain their defamatory meaning and require evidence demonstrating, as a matter of fact, that substantial injury resulted to the plaintiff from their use. *Schaffer*, 196 Ill. App. 3d at 731, citing *Heerey v. Berke* (1989), 188 Ill. App. 3d 527, 532, 544 N.E.2d 1037.

■ Words are considered defamatory *per se* in Illinois if they: (1) impute the commission of a criminal offense; (2) impute infection with a loathsome communicable disease; (3) impute inability to perform or want of integrity in discharge of duties of office or employment; or (4) prejudice a party, or impute lack of ability, in his trade. *Mittelman v. Witous* (1989), 135 Ill. 2d 220, 238-39, 552 N.E.2d 973.

■ In *Mittelman*, the Illinois Supreme Court reaffirmed the use of the "innocent construction" rule in Illinois. The rule, as modified in the case of *Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 442 N.E.2d 195, provides as follows:

"[A] written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se*." (*Chapski*, 92 Ill. 2d at 352.)

If a statement is reasonably capable of a nondefamatory interpretation, given its context, it should be so construed, and there is no balancing of reasonable constructions. *Mittelman*, 135 Ill. 2d at 232.

Accordingly, we must resolve whether the allegedly defamatory statements are capable of being innocently construed. We note that defendants have not asserted that the publications at issue are not capable of a defamatory interpretation in the first instance. A clear understanding of the context of the statements is necessary to resolution of this issue. Plaintiff contends that the statement in defendants' report that "with regard to disciplining attorneys implicated in Operation Greylord, the [s]upreme court has treated less prominent attorneys far more harshly than prominent ones with similar ethical lapses" is defamatory. The statements in the Sun-Times arti-

cle plaintiff contends are defamatory, in substance, are that plaintiff and other lawyers were the recipients of "favoritism" from the supreme court in connection with their disciplinary actions.

Defendants' report was entitled "REPORT OF THE CHICAGO COUNCIL OF LAWYERS ON JUDICIAL CANDIDATES FOR THE ILLINOIS SUPREME COURT FOR VACANCIES FROM COOK COUNTY IN THE PRIMARY ELECTIONS TO BE HELD ON MARCH 20, 1990." The five-page report with attachments, in its entirety, is devoted to a review and criticism of the Illinois Supreme Court and evaluations of candidates for vacancies in the court in the upcoming election. The article is entitled "State high court accused of favoritism on ethics," and is concerned with defendants' criticism of the Illinois Supreme Court's handling of the aforementioned ethics cases as well as the evaluations defendants gave judicial candidates.

■ Given the context of the statements relating to plaintiff being a beneficiary of "favoritism," which must be considered (*Mittelman*, 135 Ill. 2d 220, 552 N.E.2d 973), it is apparent that the statement can reasonably be innocently (indeed logically) construed as criticizing the Illinois Supreme Court, and not plaintiff. To be the beneficiary of "favoritism," does not, as plaintiff implies, necessarily suggest wrongdoing on the part of plaintiff in his relations with the court. One may be a favorite for any number of reasons that do not implicate any wrongdoing.

As to the statement in the report, in conjunction with Gilbert's statement, that plaintiff was "implicated in Operation Greylord," plaintiff contends that this statement conveys the following: "To say that one has been 'implicated' in 'Operation Greylord' is to state that that person has been identified in an incriminating way in the federal investigation into judicial corruption in Cook County, Illinois. Defendants' statement accused plaintiff of having engaged in the type of conduct which formed the basis of the Operation Greylord investigation and gave rise to the indictment and conviction of various attorneys, judges and court personnel."

As support for this interpretation, plaintiff puts forth a dictionary definition of the word "implicate" which defines the word as "to involve intimately *or* incriminatingly" (emphasis added). Thus, according to plaintiff's *own* definition of the word, defendants' statement that he was implicated in Operation Greylord can reasonably be innocently interpreted to mean that plaintiff was only intimately involved in Operation Greylord. Another dictionary definition supplies a definition of the word "implicate" as, *inter alia*, "to

involve as a consequence, corollary, or natural inference." (Webster's Ninth New Collegiate Dictionary 605 (1989).) This definition suggests a reasonable innocent construction of defendants' statement amounting to the observation that plaintiff's disciplinary proceeding before the Illinois Supreme Court was a consequence of Operation Greylord. It is important to note, as the trial court observed and as we have indicated, that the innocent construction rule does not allow for the balancing of reasonable constructions, and we need not decide whether defendants' interpretation of the statements at issue or plaintiff's is more reasonable than the other.

■ In holding as we do, we do not suggest that any seemingly innocent alternative definition from a reputable dictionary necessitates that a court hold that a statement may reasonably be innocently construed. The gist of the innocent construction rule is that the statement is to be construed in the context it is published in, and that words should be given their natural and obvious meanings. While the fact that one of several alternative dictionary definitions provides for an innocent interpretation of a statement is persuasive authority that a statement has a reasonable innocent construction, such an alternative definition is not dispositive of the issue.

*Berkos v. National Broadcasting Co.* (1987), 161 Ill. App. 3d 476, 515 N.E.2d 668, upon which plaintiff heavily relies, is distinguishable. There, the court held that plaintiff's complaint complaining of defendants' broadcast of a news report pertaining to Operation Greylord stated a cause of action for libel *per se.* In *Berkos,* the entire focus of the broadcast was on judicial corruption, and the plaintiff-judge was, according to the court, referred to in such a manner as to impute that the plaintiff had engaged in criminal conduct. Here, on the other hand, while the context of the complained-of publications is on judicial shortcomings, the plaintiff is not a judge. Additionally, because the *Berkos* court did not have the benefit of the *Mittelman* decision, it may have misapplied the innocent construction rule, as evidenced by the following reasoning. "We cannot say that the insinuation here is so equivocal or ambiguous that an innocent interpretation is equally or more reasonable. As a result the trial court's orders cannot be affirmed either on the basis that [defendant's] remarks would not be understood as defamatory by a reasonable viewer of ordinary intelligence, or on the ground that the remarks are more reasonably construed as innocent in their overall context." (*Berkos,* 161 Ill. App. 3d at 488.) Such reasoning evinces the balancing process which our supreme court in *Mittelman* specifically disapproved. (See *Mittelman,* 135 Ill. 2d at

232 (where the court, in response to the argument by Mittelman that dismissal of the defamation count was appropriate "only where the court finds an innocent construction is 'equally or more reasonable' than a defamatory construction," observed "[t]here is no balancing of reasonable constructions as Mittelman suggests").) The *Berkos* court, however, did make a perceptive observation that in the context of the news report, the question arose as to what newsworthy value the reference to the plaintiff would have served absent the interpretation plaintiff suggested. (*Berkos*, 161 Ill. App. 3d at 487.) Here, on the other hand, the reference to plaintiff's disciplinary case and treatment from the supreme court served as an illustration of defendants' criticisms of the Illinois Supreme Court.

■■ As the statements in this case are capable of reasonably being construed in a manner that does not impute the commission of a crime, impute a want of integrity in the discharge of plaintiff's duties as an attorney or prejudice plaintiff in his profession, we hold that plaintiff has failed to state a cause of action for defamation *per se*. Thus, the trial court was correct in dismissing count I of the original and proposed amended complaints.

It follows that as plaintiff has failed to state a cause of action for defamation *per se*, count II, alleging invasion of privacy (false light), must fail as well. Plaintiff admits as much in his briefs and again at oral argument. See *Schaffer*, 196 Ill. App. 3d at 734-36.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

MURRAY, J., concurs.

JUSTICE LaPORTA, dissenting:

I respectfully dissent from the opinion of the majority and would reverse the trial court's order of dismissal with prejudice of the defamation and false light invasion of privacy claims brought by the plaintiff.

As the majority points out, this appeal comes before us because of the trial court's dismissal of the complaint for defamation *per se* on defendant's section 2—615 motion and its denial with prejudice of plaintiff's subsequent motion to reconsider or, in the alternative, for leave to file an amended complaint for defamation *per se*. The section 2—615 motion challenges the sufficiency of the allegations of the complaint and supporting exhibits to state a cause of action, and matters outside the allegations of the complaint including af-

firmative defenses such as substantial truth may not be considered. Ill. Rev. Stat. 1989, ch. 110, par. 2—615.

The majority correctly states that the pivotal issue is whether plaintiff has sufficiently alleged a *per se* defamation cause of action so that special damages need not be pled. It is my opinion that the allegations of the proffered amended complaint do allege a *per se* defamation cause of action.

Initially the plaintiff filed his complaint against the Chicago Council (Council) and Gilbert in two counts alleging defamation and false light invasion of privacy seeking compensatory and punitive damages without pleading special damages. Defendants moved for dismissal pursuant to section 2—615 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—615). The motion was based on three grounds: (1) the Council report did not mention Harte by name; (2) the statements in the report and in the Sun-Times news story may reasonably be innocently interpreted; and (3) the statements in the report and the news article are substantially true.

The court entered its order on July 5, 1990, which provided in part: "Count I for per se defamation and Count II for per se false light invasion of privacy are stricken. Leave to replead in defamation per se is denied. *** Plaintiff is given 28 days to file an amended complaint for per quod defamation and false light invasion of privacy on or before August 2, 1990." The trial judge granted the motions on the bases that the statement can be innocently construed and that Harte was not specifically named in the report. The court did not consider whether the statements were true.

I am of the opinion that plaintiff should have been given leave to replead either *per se* or *per quod* defamation at his election and that the restriction to a *per quod* claim was error.

Following the trial court's striking of plaintiff's original complaint on defendant's motion to dismiss and denial of leave to replead in defamation *per se* while granting leave to replead for *per quod* defamation and false light invasion of privacy, plaintiff moved for reconsideration or in the alternative for leave to file an amended complaint for defamation *per se* and false light invasion of privacy. A copy of the amended complaint was attached to the motion. The trial court denied plaintiff's motion and stated in part: "Because plaintiff has failed to file an amended complaint for either defamation *per quod* or false light invasion of privacy alleging special damages, this action is dismissed with prejudice."

In my view the court clearly erred in dismissing plaintiff's cause of action with prejudice thereby extinguishing his right to respond in a litigation forum to the Council's published report and its links to the resulting published news story which identified him by name in a story about crime, corruption and public wrongdoing. Both orders are appealed.

The amended complaint proffered by plaintiff which was rejected by the court is in summary as follows: Count I seeks compensatory and punitive damages from the defendants for defamation *per se*. Its allegations are that plaintiff was admitted to the practice of law in 1959 and that he enjoyed a good name and reputation among acquaintances and in the community prior to and at the time of the defendants' conduct complained of. He alleges that on or about February 6, 1990, defendant Council "created, promoted and published its report" on supreme court candidates (a copy is attached as an exhibit to the complaint) which "falsely, wrongfully and maliciously" stated:

> "Moreover, with regard to disciplining attorneys *implicated in Operation Greylord*, the Supreme Court has treated less prominent attorneys far more harshly than prominent ones with similar ethical lapses. This leads to the appearance that who you are or who you know may be more important to the result in the Supreme Court than the merits of the case itself." (Emphasis added.)

Plaintiff then alleges that defendant Gilbert, then president of defendant Council, contemporaneously met with members of the press at which time he advised a news reporter with the Chicago Sun-Times that "one example of alleged favoritism in *Greylord cases* involved several prominent lawyers who each gave $1,000 to convicted Circuit Judge Richard LeFevour." (Emphasis added.) Plaintiff alleges that the Sun-Times news article published on February 9, 1990 (a copy is attached as an exhibit to the complaint), identified plaintiff by name as one of the persons "in Greylord cases." Plaintiff alleges on information and belief that defendant Gilbert specifically identified plaintiff by name to the reporter as one of the persons implicated in Greylord cases.

Plaintiff alleges that Operation Greylord was a highly publicized criminal investigation of corruption by members of the bar, of the judiciary and nonjudicial court personnel. He acknowledges that he was the subject of an attorney discipline case decided by the supreme court in June 1988, and alleges that the Council appeared, intervened and participated in that proceeding by filing an *amicus*

*curiae* brief (a copy is attached as an exhibit to the complaint) and knew the nature and origins of the charges against plaintiff and the true facts of the case, knew plaintiff's sworn and unrebutted testimony relating to those charges, knew that he was not "implicated in Operation Greylord" nor was he the target of any Federal investigation into criminal wrongdoing or illegal activity. He alleges the Council tacitly endorsed differing levels of discipline in those cases and acknowledged there might be mitigating factors in some of the cases. He alleges that the Council knew that the supreme court did not impose different sanctions on the basis of favoritism exhibited by the court for conduct amounting to "similar ethical lapses" by the attorneys and that the Council further knew that plaintiff had not engaged in conduct intended to interfere with the administration of justice. Plaintiff alleged that defendants' statement in its report and to the press imputed to the plaintiff the commission of a crime and the lack of integrity in his profession and when the statements were made defendants knew them to be false. Plaintiff alleged that the statements were made with malice, with knowledge that they were false and were intended to publish false statements of fact against plaintiff to advance defendants' political goals. In count II for invasion of privacy plaintiff alleged the defendants' statements placed him in a false light before the public and he sought compensatory and punitive damages. No special damages were pled.

The defendants contend that the Council report, which did not identify Harte by name, the press release and the news story are not about Harte but instead are a criticism of the supreme court.

The Council concludes in its report that

> "with regard to disciplining attorneys implicated in Operation Greylord, the Supreme Court has treated less prominent attorneys far more harshly than prominent ones with similar ethical lapses. This leads to the appearance that who you are or who you know may be more important to the result in the Supreme Court than the merits of the case itself. In addition, some of the lawyers who were not disciplined had contributed to the election campaigns of some members of the Supreme Court. This highlights the Supreme Court's insensitivity to ethics and proper procedure and the problems inherent in a judicial selection system where judges must run for office and collect campaign contributions from lawyers who will appear before them."

This conclusion, when coupled with plaintiff's allegations that defendant Gilbert advised the Sun-Times reporter (the news story credited the statement to Gilbert) that "one example of alleged favoritism in Greylord cases involved several prominent lawyers who each gave $1,000 to convicted Circuit Judge Richard LeFevour," and plaintiff's allegation on information and belief that defendant Gilbert specifically identified plaintiff by name to the reporter as one of the persons implicated in Greylord cases, resulted in the publication of the Sun-Times news story in which Harte is specifically named. The news story followed the Council's release of its report to the press.

The Sun-Times story in pertinent part was as follows:

> *"State high court accused of favoritism on ethics*
> By Tom Gibbons.
>
> The Illinois Supreme Court has shown a woeful lack of leadership in coping with judicial scandals and has shown favoritism to big-name lawyers charged with unethical conduct, a bar group said Thursday.
>
> The Chicago Council of Lawyers issued a scathing report as it announced its evaluations of the nine judges running in the March 20 primary for two seats on the Supreme Court ***.
> ***
>
> The 1,400 member group leveled strong criticism at the court's 'insensitivity to ethics'—especially in the shadow of the Operation Greylord scandal. Jeffrey B. Gilbert, council president, said one example of alleged favoritism in Greylord cases involved several prominent lawyers who each gave $1,000 to convicted Circuit Court Judge Richard LeFevour.
>
> Though the lawyers—[P.C.], William Harte, [W.M.] and [R.M.]—had no cases before LeFevour, they faced disciplinary action for giving money to a judge. Some of them also made campaign gifts to Supreme Court justices.
>
> The Supreme Court refused to discipline the lawyers, but Gilbert said a lesser-known attorney, [W.K.], who was a middle-man between LeFevour and the four lawyers, had his law license suspended for two years." Chicago Sun Times, February 9, 1990, at 20, col. 1.

I would observe that unless the Council suggests that the reporter drew the names from some other source to flesh out the conclusion of favoritism in the report, there is no other conclusion that can be reached but that the questions asked of the Council's spokesperson, Gilbert, and his answers given at the news conference or at

another time before the story was written, identified Mr. Harte by name as one of the supreme court's favorites.

I am troubled by certain conclusions of the majority with which I cannot agree.

With respect to the charge of "favoritism" the majority finds it to be apparent that the statement can be innocently construed as criticizing the supreme court and not the plaintiff. The majority then concludes that "[t]o be beneficiary of 'favoritism,' does not, as plaintiff implies, necessarily suggest wrongdoing on the part of the plaintiff in his relations with the court. One may be a favorite for any number of reasons that do not implicate any wrongdoing." (220 Ill. App. 3d at 261.) I disagree with the conclusion.

Black's Law Dictionary defines "favoritism" as "invidious preference and selection based on friendship and factors other than merit." (Black's Law Dictionary 548 (5th ed. 1979).) The Council's report concludes that "who you are or who you know may be more important to the result in the Supreme Court than the merits of the case itself." Given the context in which the statement is made here, the obvious conclusion to be drawn is that the one who dispenses favoritism and the one who receives favored treatment are equally suspect and culpable of the charged improper conduct. I submit that the majority's conclusion that reference to plaintiff's disciplinary case and his "favored" treatment by the court was intended only as an illustration of defendants' criticism of the court and was not defaming to plaintiff is not a valid conclusion.

I depart from the majority in its conclusion that the allegedly defaming words are capable of an innocent construction and therefore are not defamatory *per se.*

In addressing plaintiff's allegation that Gilbert's statement to the reporter identified plaintiff as an attorney "implicated in Operation Greylord," the majority concludes that plaintiff's own dictionary definition of the word "implicate," *i.e.,* "to involve intimately *or* incriminatingly," renders defendants' statement capable of a reasonable innocent interpretation and therefore is not defamatory *per se.* (Emphasis added.) (See 220 Ill. App. 3d at 261.) It concludes that the trial court found the alleged defamatory words to be capable of an innocent construction, dismissed the original complaint and refused to permit an amendment for defamation *per se* on the basis of a possible innocent construction.

I disagree that the phrase "implicated in Operation Greylord" conveys an innocent message. Because of its wide public disclosures, Operation Greylord connotes serious wrongdoing and corrup-

tion. To be implicated "intimately or incriminatingly" in Operation Greylord connotes to the reader that the party is closely connected to that specific serious wrongdoing and corruption. In my view, to hold that such a statement is not defamatory *per se* is completely contrary to any reasonable interpretation of the statement or the intent of its author. Therefore, I strongly disagree with the majority opinion and can find no reasonably innocent construction in the phrase "implicated in Operation Greylord."

The modified innocent construction rule of *Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 352, reiterated by the supreme court in *Mittelman v. Witous* (1989), 135 Ill. 2d 220, 232, 552 N.E.2d 973, states:

> " '[A] written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se*.' " (*Mittelman*, 135 Ill. 2d at 232, quoting *Chapski*, 92 Ill. 2d at 352.)

If the statement has reasonably "innocent construction" capabilities it should be so construed. *Mittelman*, 135 Ill. 2d at 232.

Here then the trial court was required to examine the statements in the context in which they were made and determine whether it was reasonable to interpret them as innocent, nondefaming statements.

For clarity we must repeat the statements plaintiff alleges are defamatory *per se* in the context in which they are alleged to have occurred.

In the Council's report:

"with regard to disciplining attorneys implicated in Operation Greylord, the Supreme Court has treated less prominent attorneys far more harshly than prominent ones with similar ethical lapses. This leads to the appearance that who you are or who you know may be more important to the result in the Supreme Court than the merits of the case itself. In addition, some of the lawyers who were not disciplined had contributed to the election campaigns of some members of the Supreme Court. This highlights the Supreme Court's insensitivity to ethics and proper procedure and the problems inherent in a judicial selection system where judges must run for office and collect campaign contributions from lawyers who will appear before them."

In the press interview with news reporters, Gilbert is alleged to have said: "[O]ne example of alleged favoritism in Greylord cases involved several prominent lawyers who each gave $1,000 to convicted Circuit Judge Richard LeFevour," and is alleged to have specifically identified plaintiff by name to the reporter as one of the persons implicated in Greylord cases.

In the Sun-Times story reporting the contents of the Council's report and the interview at which the report was released to the press:

"The Illinois Supreme Court has shown a woeful lack of leadership in coping with judicial scandals and has shown favoritism to big-name lawyers charged with unethical conduct, a bar group said Thursday.

The Chicago Council of Lawyers issued a scathing report as it announced its evaluations of the nine judges running in the March 20 primary for two seats on the Supreme Court ***. ***

The 1,400 member group leveled strong criticism at the court's 'insensitivity to ethics'—especially in the shadow of the Operation Greylord scandal. Jeffrey B. Gilbert, council president, said one example of alleged favoritism in Greylord cases involved several prominent lawyers who each gave $1,000 to convicted Circuit Court Judge Richard LeFevour.

Though the lawyers—[P.C.], William Harte, [W.M.] and [R.M.]—had no cases before LeFevour, they faced disciplinary action for giving money to a judge. Some of them also made campaign gifts to Supreme Court justices.

The Supreme Court refused to discipline the lawyers, but Gilbert said a lesser-known attorney, [W.K.], who was a middle-man between LeFevour and the four lawyers, had his law license suspended for two years." Chicago Sun-Times, February 9, 1990, at 20, col. 1.

Plaintiff has alleged the statements are false, that when they were made the Council and Gilbert knew them to be false and that the statements defaming Harte were made with malice and intended to accomplish the Council's goals and without regard for the damage it would do to the plaintiff in his professional reputation.

In my view, taken together, the report, the alleged statements by Gilbert to the reporter and the news story which identifies Harte are more reasonably construed as defamatory to the plaintiff than as reasonably capable of an innocent construction. Therefore they are defamatory *per se.*

I would observe that there is a very fine line between appropriate comment and defamation/slander/libel. Where a "report" makes charges which, while intended to criticize the members of the judiciary who hold public office, portrays other nonpublic persons as near equal participants in alleged improper conduct, the obvious result is that one's reputation built over a period of time can be destroyed or at a minimum greatly diminished in the dissemination of that report to the public.

A lawyer's reputation, which includes his integrity and legal ability, is the foundation on which he builds his professional career. Where a lawyer has practiced for 30 or more years, as has the plaintiff here, any public charge of wrongdoing, lack of ability or want of integrity does immeasurable damage to the public's perception of him as a respected member of the legal community. It is difficult to conceive of any way in which the damage done by defamatory comment can be corrected. Plaintiff is entitled to access to the courts for a full airing of his claim against the persons making such a charge and for the opportunity to prove the defaming statements to be untrue. I would reverse and remand.