PATRICK A. TUITE, Plaintiff-Appellant, v. MICHAEL CORBITT *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—03—3768

Opinion filed June 7, 2005.

WOLFSON, J., specially concurring in part and dissenting in part.

Deutsch, Levy & Engel, Chtrd., of Chicago (Paul M. Levy, Phillip J. Zisook, and Brian D. Saucier, of counsel), for appellant.

Jenner & Block, of Chicago (David P. Sanders, of counsel), and Hogan & Hartson, L.L.P., of New York, New York (Slade R. Metcalf and Jeffrey O. Grossman, of counsel), for appellees.

JUSTICE GARCIA delivered the opinion of the court:

In May 2003, the plaintiff, Patrick Tuite, filed a complaint for defamation *per se*, false light invasion of privacy, and intentional inflic-

tion of emotional distress against the defendants, Michael Corbitt, Sam Giancana, and Harper Collins Publishers, for statements made in their book, *Double Deal*. In August 2003, the defendants filed a motion to dismiss the complaint pursuant to section 2—615 of the Code of Civil Procedure (Code) (735 ILCS 5/2—615 (West 2002)). In November 2003, the trial court granted the defendants' motion finding that the statements at issue were not defamatory *per se* under the innocent construction rule, the plaintiff failed to allege special damages for his false light claim, and the statements were not so extreme and outrageous to sustain a claim for intentional infliction of emotional distress. The plaintiff appeals, arguing (1) when read in context, the statements are not reasonably capable of an innocent construction and the trial court erred in dismissing his defamation and false light invasion of privacy claims, and (2) his complaint adequately alleged a cause of action for intentional infliction of emotional distress. For the reasons that follow, we affirm the judgment of the trial court.

## I. BACKGROUND

Corbitt and Giancana co-authored the book *Double Deal*, which was published by Harper Collins. The plaintiff's complaint alleges that Corbitt is a self-admitted professional criminal, whose life of crime was in the service of the Chicago mafia, also known as the Outfit, while Giancana is the godson and namesake of Chicago mafioso Sam "Momo" Giancana. *Double Deal* is a nonfiction book that chronicles the criminal activities of Corbitt and others within organized crime in the Chicago area. The book was touted as "The Inside Story of Murder, Unbridled Corruption, and the Cop Who Was a Mobster," and the title referred to the fact that Corbitt, who was both a police officer and a trusted mafia insider, "played both ends" making him the "consummate double dealer."

The plaintiff alleges that the following statements from the book concerning the 1985 trial of alleged Chicago mob boss Joey Aiuppa are false and defamatory *per se* in that they impute criminal wrongdoing to the plaintiff, want of integrity as an officer of the court and in the performance of his ethical duties as an attorney, and an inability to perform his professional duties as a criminal defense attorney.

"Unfortunately for the Outfit, during Strawman, the FBI had uncovered tons of evidence connecting the Chicago bosses to the guys in Kansas City. When the FBI started calling this new case against Chicago's top bosses Strawman II, it was pretty clear they were on a roll.

Although Strawman II put a crimp in Chicago's top guys, particularly Joey Aiuppa, at first they figured they could beat the

charges. But then when witnesses starting [*sic*] lining up against them, they began to get worried. \*\*\* From what I understood, they knew enough to bury just about everybody who was anybody in the Outfit.

And it was no use trying to take them out, either. \*\*\* [T]hey were virtually untouchable.

\*\*\* [B]y the time the trial got under way in 1985, there were guys flipping left and right. It was pretty clear that the Chicago Outfit was going to take a major hit. Sal told me Joey Aiuppa figured he was going away for sure if he didn't get some better representation. At seventy-seven, Joey Aiuppa was an old man, and he didn't want to die in prison. He was desperate to walk away from those charges and wanted to bring in Pat Tuite, an attorney who'd represented mob cases in the past. But Sal said that Aiuppa had run into a wall with Tuite. Supposedly, the big-shot lawyer told Aiuppa that he'd need a million-dollar retainer before he'd even walk in the door.

It might seem crazy, playing hardball with an Outfit boss like that, but Tuite had his reasons; he was far from stupid. He knew that Outfit guys had a reputation for not paying their attorneys. They'd get off and then leave the lawyer holding the bag. If the guy made any noise about his bill, it was 'take me to court,' which, of course, no one ever had the balls to do.

So now Aiuppa and his pals had a dilemma. They didn't want to go on their kick, take their defense money out of their own pockets. So what did they do? They decided to go to Las Vegas—the now crime-free town—and let their skim pay Tuite.

[In the next paragraphs, Corbitt describes how he and others traveled to Utah to pick up duffle bags containing $1 million in one-hundred-dollar bills and delivering it to another individual in Chicago. After they returned to Chicago, Corbitt states, 'I understand Tuite got his retainer later that night.']

After Tuite was on the case, all the guys were sort of semijubilant [*sic*]. Everybody figured Tuite had it all handled. To Aiuppa and his codefendants, it was like it was a done deal, like they were all going to be acquitted. So you can imagine their reaction when they were all found guilty the following January—1986. \*\*\* And what about Tuite? What kind of explanation could he possibly have given for this result? I can't think of one that would've satisfied me—not after advancing him a million bucks for his legal fees. And I guess that's why, for the life of me, I've never understood why Pat Tuite didn't get whacked. Go figure."

The plaintiff asserts that these statements are false because (1) he only served as a consultant to Aiuppa's attorneys and he was not retained by Aiuppa, was not the attorney of record, and did not

participate in and did not represent Aiuppa at the trial; and (2) he did not demand or receive a retainer of $1 million cash and did not knowingly receive any payment for his consulting services that was comprised of illegally obtained funds. Additionally, he claims the statements falsely imply the plaintiff would use all or a portion of the $1 million cash retainer to commit bribery or other criminal conduct so as to ensure that he "had it all handled" and that the acquittal of Aiuppa and his codefendants was "a done deal."

The plaintiff also alleges that statements in the author's note in the book, Corbitt's statements on the "Today Show," and Corbitt's comments that he was surprised that Tuite had not been "whacked" were extreme and outrageous and caused him severe emotional distress. Corbitt writes in the author's note, "there's a good chance somebody's gonna get whacked over this book. But hey, if they do, well ... f--- em. Those are the people I don't give two s---- about. That's right. I don't care. Far as I'm concerned, they had it comin'." On the "Today Show" he stated that the book had "put [others] in jeopardy" and that someone might get "whacked" as a result. The plaintiff alleges that he suffered anxiety and feared for his safety and the safety of those around him as a result of the statements.

In May 2003, the plaintiff sued the defendants for defamation *per se*, false light invasion of privacy, and intentional infliction of emotional distress. In August 2003, the defendants filed a motion to dismiss. The plaintiff then filed an amended complaint and attached a full copy of *Double Deal* as an exhibit. The trial court granted the defendants' motion to dismiss, explaining that it read *Double Deal*, "cover to cover, as the court is required to do when assessing the innocent construction rule." The court then found that "the words themselves permit an innocent construction whether that construction is more reasonable than any other construction, is something that the court does not engage in as long as there is a reasonable construction." Additionally, the court found that because the plaintiff did not plead special damages the false light claim also failed. Further, "the marketing statement at the front of the book and the other allegations are too vague and express opinions and don't rise to the level of outrageousness that this court requires when looked at in a reasonable person's standard."

This appeal followed.

## II. ANALYSIS

On appeal, the plaintiff argues (1) when read in context, the statements are not reasonably capable of an innocent construction and (2) his complaint adequately alleged a cause of action for intentional infliction of emotional distress.

## A. Standard of Review

■ A motion to dismiss filed pursuant to section 2—615 of the Code attacks the legal sufficiency of a plaintiff's complaint. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 86, 672 N.E.2d 1207 (1996). When reviewing a motion to dismiss, a court must accept as true all well-pleaded facts and interpret the allegations in the complaint in the light most favorable to the plaintiff. *Bryson*, 174 Ill. 2d at 86. A court will not dismiss a cause of action unless it appears that no set of facts could be proved which would entitle the plaintiff to recover. *Bryson*, 174 Ill. 2d at 86-87. "The question to be determined is whether sufficient facts are contained in the pleadings which, if established, may entitle the plaintiff to relief." *Stroger v. Regional Transportation Authority*, 201 Ill. 2d 508, 516, 778 N.E.2d 683 (2002). The applicable standard of review for a section 2—615 motion is *de novo*. *Stroger*, 201 Ill. 2d at 516.

## B. Defamation *Per Se*

In his complaint, the plaintiff alleges that the statements in *Double Deal* concerning his alleged representation of Aiuppa are false and defamatory *per se* in that they imputed (1) criminal wrongdoing, (2) want of integrity as an officer of the court, (3) want of integrity in the performance of his ethical duties as an attorney, and (4) an inability to perform his professional duties as a criminal defense lawyer. He argues that the trial court erred in finding that the innocent construction offered by the defendants was reasonable within the context of the book.

■■ A statement is defamatory if it "tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with [him]." *Bryson*, 174 Ill. 2d at 87. Where a plaintiff alleges that a statement is defamatory *per se*, he need not plead or prove actual damages to his reputation. This is because statements that are defamatory *per se* "are thought to be so obviously and materially harmful to the plaintiff that injury to [his] reputation may be presumed." *Bryson*, 174 Ill. 2d at 87. Illinois courts have recognized five categories of statements that are defamatory *per se*: (1) those imputing the commission of a criminal offense; (2) those imputing infection with a loathsome communicable disease; (3) those imputing an inability to perform or want of integrity in the discharge of duties of office or employment; (4) those that prejudice a party or impute lack of ability in the party's trade, profession or business; and (5) those imputing adultery or fornication. *Bryson*, 174 Ill. 2d at 88-89. The plaintiff alleges the statements in *Double Deal* fall within categories (1), (3), and (4).

Even where a statement falls into one, or three, of these categories,

it will not be found defamatory *per se* if it is reasonably capable of an innocent construction. *Bryson*, 174 Ill. 2d at 90. The rule of innocent construction requires a court to determine whether the statement can reasonably be innocently interpreted. *Bryson*, 174 Ill. 2d at 90. A court is required to consider the statement in context and to give its words and implications their "natural and obvious meaning." *Chapski v. Copley Press*, 92 Ill. 2d 344, 352, 442 N.E.2d 195 (1982). "Whether a statement is reasonably susceptible to an innocent interpretation is a question of law for the court to decide." *Bryson*, 174 Ill. 2d at 90.

The innocent construction rule does not, however, require a court to "strain to find an unnatural but possibly innocent meaning for words where the defamatory meaning is far more reasonable." *Bryson*, 174 Ill. 2d at 94. The court will interpret the words of the statement as they appear to have been used and according to the idea they were intended to convey to the reasonable reader. *Bryson*, 174 Ill. 2d at 93. "When a defamatory meaning was clearly intended and conveyed, [a] court will not strain to interpret allegedly defamatory words in their mildest and most inoffensive sense in order to hold them nonlibellous under the innocent construction rule." *Bryson*, 174 Ill. 2d at 93.[1]

In *Bryson*, the plaintiff sued the author and publisher of a fictitious article in which the plaintiff is called a "slut." The defendants claimed that the statement was not defamatory *per se* because the word "slut" could be innocently construed to describe the plaintiff as a bully. The defendants pointed to a number of nondefamatory definitions of "slut" found in the dictionary, including " 'a bold, brazen girl.' " *Bryson*, 174 Ill. 2d at 92-93, quoting American Heritage

---

[1]We note that in granting the defendants' motion to dismiss, the trial court stated that "the words themselves permit an innocent construction whether that construction is more reasonable than any other construction, is something that the court does not engage in as long as there is a reasonable construction." The plaintiff contends that the court used the wrong standard by not considering the context in which the words were used when determining whether the statement could be innocently construed. Under the plaintiff's contention, the court misspoke when it made this statement. However, it is clear from the record that the court considered the statement in the context of the entire book after reading it "cover to cover." It is also clear that the court was aware that *Bryson* required it to determine whether the allegedly defamatory statements were capable of a reasonable, innocent construction by interpreting the words of the statement as they appear to have been used and according to the idea they were intended to convey to the reasonable reader. *Bryson*, 174 Ill. 2d 93. Even if the court's statement was in error, this court can affirm a trial court's judgment on any grounds that are called for by the record. *City of Chicago v. Holland*, 206 Ill. 2d 480, 492, 795 N.E.2d 240 (2003).

Dictionary 1153 (2nd Coll. ed. 1985). The supreme court refused to find an innocent construction of the statement because it found that in the context of the article the word "slut" was used to describe the plaintiff's sexual proclivities. *Bryson*, 174 Ill. 2d at 94; see also *Parker v. House O'Lite Corp.*, 324 Ill. App. 3d 1014, 1025-26, 756 N.E.2d 286 (2001) (statements that plaintiff was involved in bid-rigging for a multimillion-dollar project were not subject to an innocent construction where a defamatory meaning was conveyed); *Gardner v. Senior Living Systems, Inc.*, 314 Ill. App. 3d 114, 119, 731 N.E.2d 350 (2000) (letter by defendant that implied plaintiff stole its software could not reasonably be innocently construed to imply plaintiff lacked rigor in following company policy but, rather, was intended to accuse plaintiff of criminal actions); *Berkos v. National Broadcasting Co.*, 161 Ill. App. 3d 476, 488, 515 N.E.2d 668 (1987) (insinuation that the plaintiff, a judge, was involved in payoffs and judicial corruption not reasonably subject to an innocent construction).

However, the court in *Salamone v. Hollinger International, Inc.*, 347 Ill. App. 3d 837, 840-41, 807 N.E.2d 1086 (2004), found that a newspaper article entitled *"Mob links hurt Rosemont casino bid"* that stated that the plaintiff was a " 'reputed organized crime figure' " could be innocently construed. "Reading the headline in conjunction with the full text of the article, we believe that defendants characterized plaintiff, not as a mobster, but as a person who is believed to be, possibly erroneously, an organized crime figure." *Salamone*, 347 Ill. App. 3d at 841. Additionally, the court in *Harrison v. Chicago Sun-Times, Inc.*, 341 Ill. App. 3d 555, 571, 793 N.E.2d 760 (2003), held that statements that the plaintiff kidnaped her daughter were capable of innocent construction. The court held that kidnaping does not necessarily denote a criminal offense because it is also used in custody contexts to describe the wrongful taking of a child. In the context of the newspaper article, the court held that an innocent construction was reasonable. *Harrison*, 341 Ill. App. 3d at 571; see also *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 413, 667 N.E.2d 1296 (1996) (comments that plaintiff could not get along with coworkers and did not follow up on assignments could be innocently constructed to mean that the plaintiff did not fit in with the organization of the employer making the assessment and failed to perform well in that particular job setting); *Harte v. Chicago Council of Lawyers*, 220 Ill. App. 3d 255, 261-62, 581 N.E.2d 275 (1991) (reasonable to construe a statement that plaintiff was implicated in a corruption scandal to mean he was intimately involved, not that he was incriminated).

■ In this case, the plaintiff contends that the defendants' statements that after the plaintiff received a $1 million retainer in cash he

"had it all handled" and that Aiuppa viewed his acquittal as a "done deal" were euphemisms for bribery and corruption. He argues that in the context of a book that described the illegal dealings of the Chicago mafia, including its bribing and corrupting of officials, witnesses, and judges, these comments imputed that the plaintiff knowingly received $1 million in illegally obtained funds for the purpose of doling out bribes and payoffs to transform an otherwise unwinnable case into one in which acquittal was a "done deal."

Corbitt wrote that Aiuppa was concerned that he would be convicted unless he got better representation; he wanted the plaintiff to serve as his attorney. When requesting a $1 million retainer fee, Corbitt wrote, the plaintiff "was far from stupid," because people like Aiuppa "had a reputation for not paying their attorneys." The plaintiff was then allegedly paid on the night that Corbitt returned from Utah with $1 million in illegally obtained funds.

After the plaintiff was on the case, Aiuppa figured the plaintiff "had it all handled." "To Aiuppa and his codefendants, it was like it was a done deal, like they were all going to be acquitted." Instead, Aiuppa and his codefendants were convicted; regarding which Corbitt wrote:

> "And what about Tuite? What kind of explanation could he possibly have given for this result? I can't think of one that would've satisfied me—not after advancing him a million bucks for his legal fees. And I guess that's why, for the life of me, I've never understood why Pat Tuite didn't get whacked. Go figure."

Although statements made in the form of insinuation, allusion, irony, or question may be defamatory (*Berkos*, 161 Ill. App. 3d at 487), in the context of the specific chapter and in the book as a whole, these statements are reasonably subject to an innocent construction. The statements can be reasonably read to indicate that Aiuppa wanted "better representation" to beat the criminal charges as "guys [were] flipping left and right" and the plaintiff had "represented mob cases in the past" and that better representation came at a price. A substantial retainer was reasonable because people like Aiuppa had a reputation for not paying their legal bills and "Tuite *** was far from stupid." Additionally, the fact that Corbitt wrote that the plaintiff played "hardball" when demanding the retainer further suggests that the funds were for the plaintiff and were not intended for bribes. If the plaintiff was involved in bribery and corruption on behalf of Aiuppa, it is unlikely he would have had to play hardball to get those funds. Further, Corbitt's statement that he understood the plaintiff was paid the night he (Corbitt) returned from Utah does not necessarily insinuate that the plaintiff knew the funds were illegally obtained.

Aiuppa's belief that the case was a done deal could reasonably be construed to mean that Aiuppa had complete faith in the plaintiff, a high-priced and experienced attorney. Aiuppa and his codefendants, perhaps as many a defendant facing overwhelming evidence of his own guilt, reacted "semijubilant" at the thought of being represented by the best lawyer money could hire; a clear and unequivocal compliment to the plaintiff's well-acknowledged trial skills. Perhaps the use of the word "semijubilant" was most apt because the prospect of facing overwhelming evidence remained (and ultimately carried the day for the government).

Corbitt's reaction to the plaintiff's alleged failure to secure an acquittal could be construed as a likely reaction by Chicago mob bosses to their guilty verdict after Aiuppa paid the plaintiff a $1 million retainer. Of course, with the benefit of some 20 years after the event, there is no need to "go figure." The answer is clear: the plaintiff was retained for the "better representation" he could provide, he was paid his retainer before the trial because he was not "stupid," he carried out his lawyerly responsibilities, whatever they were (we accept as true the plaintiff's claim that he served merely as a consultant), and the evidence won out as it generally does. The dissent focuses on the possible reading of the passage as suggesting that "corrupt methods" were imputed to Tuite. The trial judge did not read this passage in this way; neither do we. That specter might have been raised had the verdict been one of "not guilty" in the face of overwhelming evidence, but that was not the case here. The legal system worked as it was meant to work—the verdict apparently rested on the evidence. The book does not suggest that "corrupt methods" were necessary to obtain a *guilty* verdict. There is no defamation *per se* as we read this passage.[2]

The plaintiff further argues that in the context of a book about the criminal activities of those involved in organized crime in the Chicago area, including corrupt public officials, these statements cannot be innocently construed. We disagree. In the context of the entire book, it is clear that the statements are reasonably subject to this innocent construction. Throughout *Double Deal*, Corbitt explicitly recounts instances of bribery and corruption. He identifies those who

---

[2]Although it played no role in our decision, we learned at oral argument that the paperback edition of *Double Deal* does not include the passage concerning the plaintiff. Consequently, it is of no moment whether this was the result of confirmation of the plaintiff's limited role as a consultant or as the more prudent action in light of the possible misinterpretation of this passage.

were involved in illegal actions and describes their crimes. Corbitt explicitly identifies what public officials were working with the Chicago mafia, including the "mobbed-up attorney Alan Masters," and the schemes in which they were involved. The plaintiff and his activities are not described in this manner. The innocent construction of these statements is neither strained nor unnatural. See *Bryson*, 174 Ill. 2d at 94.

## C. False Light Invasion of Privacy

■ The plaintiff also argues that the statements in *Double Deal* support a cause of action for false light invasion of privacy. To sustain this cause of action, a plaintiff must plead: (1) he was placed in a false light before the public by the defendant; (2) the false light would be offensive to a reasonable person; and (3) the defendant acted with actual malice. *Salamone*, 347 Ill. App. 3d at 844. However, because the plaintiff's defamation *per se* claim fails, his false light invasion of privacy claim fails as well. See *Harte*, 220 Ill. App. 3d at 263.

## D. Intentional Infliction of Emotional Distress

The plaintiff next argues that the trial court erred in dismissing his claim for intentional infliction of emotional distress. The plaintiff contends that Corbitt's comment that he was surprised that the plaintiff did not get "whacked," along with his statement in the author's note that "there's a good chance somebody's gonna get whacked over this book. *** Far as I'm concerned, they had it comin'," provoke and advocate murder. Specifically, the individuals named in *Double Deal* who are neither dead nor incarcerated, including the plaintiff, faced "a good chance" of being "whacked" and that such individuals "had it comin'."

■ To state a cause of action for intentional infliction of emotional distress, a plaintiff must allege: (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that his conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress. *Thomas v. Fuerst*, 345 Ill. App. 3d 929, 935, 803 N.E.2d 619 (2004). Whether the defendant's conduct is extreme and outrageous is determined by the facts and the circumstances of each case and is evaluated on an objective standard. *Thomas*, 345 Ill. App. 3d at 936. Liability attaches only in circumstances where the defendant's conduct is so outrageous and extreme that it goes beyond all possible bounds of decency. It does not, however, extend to " 'mere insults, indignities, threats, annoyances, petty oppressions or trivialities.' " *Thomas*, 345 Ill. App. 3d at 936, quoting *Public Finance Corp. v. Davis*, 66 Ill. 2d 85, 89-90, 360 N.E.2d 765 (1976). "The

distress inflicted must be so severe that no reasonable person could be expected to endure it." *Thomas*, 345 Ill. App. 3d at 936.

■ In this case, we agree with the trial court that the comments in *Double Deal* and that Corbitt made on the "Today Show" express opinions and are too vague to rise to the level of outrageous and extreme conduct. This finding does not ignore the context in which the statements were made. Corbitt did state that he was surprised that after Aiuppa was convicted the plaintiff was not killed; however, all this happened almost 20 years before *Double Deal* was published. Corbitt's comments about something that did not happen, over an event that occurred nearly 20 years ago, does not rise to the level of outrageous and extreme conduct so as to make those comments actionable now.

Further, although Corbitt admits he wrote *Double Deal* for revenge, the book makes it clear that he wanted revenge against those in the Chicago mafia that wanted to have him killed and indicated that his son could be killed as well. In the context of *Double Deal*, the complained-of comments are vague and are not so outrageous as to support a claim for intentional infliction of emotional distress.

### III. Conclusion

For the reasons stated, we affirm the judgment of the trial court dismissing the plaintiff's amended complaint.

Affirmed.

HALL, J., concurs.

JUSTICE WOLFSON, specially concurring in part and dissenting in part:

What could Corbitt and Giancana have had in mind when they wrote about Tuite? What did they intend their readers to understand? Could they merely have been praising Tuite's formidable talents as a defense lawyer? I believe they intended to and did write about hoodlums who thought they had hired a lawyer who would and could do whatever was illegally necessary to fix their pending federal prosecution, including bribes and payoffs. I do not believe a reasonable reader would understand the words about Tuite to be a paean about the joys and satisfaction of hiring an expensive lawyer.

The authors claimed to have written a book about "unbridled corruption." In that context they described a million dollar payment to Tuite, in hundred dollar bills, under the cover of darkness. That made the "guys *** sort of semijubilant." "Everybody figured Tuite had it

all handled." "To Aiuppa and his codefendants, it was like a done deal, like they were all going to be acquitted."

The reasonable reader would not take those words merely as an expression of confidence in a lawyer by his clients. That would not be very interesting. This was a case that admittedly could not be won on its merits. How else could victory be acheived? By the corrupt methods imputed to Tuite by the authors. That is libel *per se*.

The majority takes the innocent construction rule too far. It does not apply "simply because allegedly defamatory words are 'capable' of an innocent construction." *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 93 (1996). In applying the rule, we must give the alleged defamatory words "their natural and obvious meaning." *Bryson*, 174 Ill. 2d at 93. We must interpret the allegedly defamatory words "as they appeared to have been used and according to the idea they were intended to convey to the reasonable reader." *Bryson*, 174 Ill. 2d at 93. When a defamatory meaning is clearly intended and conveyed:

> "this court will not strain to interpret allegedly defamatory words in their mildest and most inoffensive sense in order to hold them nonlibellous under the innocent construction rule." *Bryson*, 174 Ill. 2d at 93.

True, the authors used a kind of code, apparently recognizing there are legal limits to what can be said about a lawyer. But the code is transparent. The clear message is that Tuite was ready and able to fix the case, that he was paid to fix it, and that he did not deliver, something that should have caused a premature end to his life. It takes more than a "strain" to apply an innocent meaning to the offending words. It takes a gyration of Olympian proportion.

Calling the plaintiff a "slut" in *Bryson* was defamatory because it was intended to describe her sexual proclivities, alternative innocent dictionary definitions aside. The court observed that the innocent construction rule does not require courts to strain to find an unnatural but possibly innocent meaning for the words where the defamatory meaning is far more reasonable. *Bryson*, 174 Ill. 2d at 94. Moreover, said the court: "Nor does it require this court to espouse a naïvet unwarranted under the circumstances." *Bryson*, 174 Ill. 2d at 94.

We have rejected application of the innocent construction rule where the defamatory words used were less offensive than the words written about Tuite. See *Parker v. House O'Lite Corp.*, 324 Ill. App. 3d 1014, 1025 (2001) (Mr. Parker has violated " 'his own specifications in rigging this bid' "); *Moriarty v. Greene*, 315 Ill. App. 3d 225, 232 (2000) ("plaintiff [psychologist] 'readily admitted that she sees her job as doing whatever the natural parents instructed her to do' "); *Kumaran v.*

*Brotman*, 247 Ill. App. 3d 216, 225 (1993) (nonlawyer plaintiff was " 'working a scam' by filing numerous lawsuits to extract monetary settlements on a full-time basis").

The analysis conducted in *Berkos v. National Broadcasting Co.*, 161 Ill. App. 3d 476 (1987), should be used here. In *Berkos*, NBC broadcasted a story about an investigation into judicial corruption. While Berkos was not directly said to have accepted a bribe or to be a corrupt judge, his name was placed in the story about other judges taking bribes. In the overall context, said the court, "references to Berkos *** [could] be reasonably interpreted by an ordinary viewer of normal intelligence as imputing criminal involvement to Berkos." *Berkos*, 161 Ill. App. 3d at 487. Otherwise, asked the court, why refer to Berkos? Here, why refer to Tuite in terms of a late-night million dollar payment, having it "all handled," and a "done deal"?

I would reverse the trial court's section 2—615 dismissal of Tuite's libel and false light counts and send them back for further proceedings. I agree with the majority that Tuite did not allege sufficient facts to support a cause of action for intentional infliction of emotional distress.