SAMPATH KUMARAN, Plaintiff-Appellant, v. BARBARA BROTMAN *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—91—1885

Opinion filed May 10, 1993.—Rehearing denied June 17, 1993.—
Modified opinion filed June 28, 1993.

Sampath Kumaran, appellant *pro se.*

Sidley & Austin, of Chicago (Richard J. O'Brien and Paul E. Veith, of counsel), for appellees Barbara Brotman and Chicago Tribune Company.

Alholm & Monahan, of Chicago (Peter A. Monahan and Debra Criche Mell, of counsel), for appellee Andrew Kochanowski.

James J. Roche & Associates, of Chicago (Maria G. Calderon, of counsel), for appellee James J. Roche.

JUSTICE BUCKLEY delivered the opinion of the court:

Plaintiff Sampath Kumaran, a former substitute school teacher and security guard, filed a *pro se* defamation complaint on June 1, 1990, against two media defendants and two nonmedia defendants. Plaintiff's complaint alleged that he had been libeled by an article published in the Chicago Tribune (the Tribune) on August 8, 1989. The media defendants are the Chicago Tribune Company (incorrectly sued as Chicago Tribune Newspaper) and the reporter who wrote the newspaper article in controversy, Barbara Brotman. The nonmedia defendants are two attorneys, James J. Roche (incorrectly sued as James B. Roche) and Andrew Kochanowski, who were quoted in the newspaper article. Defendants filed motions pursuant to section 2—615 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—615 (now 735 ILCS 5/2—615 (West 1992))) to dismiss the action. On March 28, 1991, the trial court sustained the motions to dismiss. Following the denial of his motion for reconsideration, plaintiff filed a timely *pro se* appeal.

Plaintiff's *pro se* briefs and supplementary materials contain oxymorons and other nonsensical remarks (such as "destructive construction," "intentionally negligent," "journalistic cannibalism," and "cannibalistic journalism") that are difficult to decipher. Plaintiff's materials also are replete with information which is extrinsic to the record on appeal and which consequently may not be considered on review. (*Etten v. Lane* (1985), 138 Ill. App. 3d 439, 442, 485 N.E.2d 1177, 1179.) Although plaintiff understandably may be confused about the law of defamation, which the Illinois Supreme Court has described as a "morass" (*Mittelman v. Witous* (1989), 135 Ill. 2d 220, 232, 552 N.E.2d 973, 978), we will identify and analyze the relevant issues in accordance with the applicable legal principles.

The newspaper article at issue was entitled, "Having his day in court is virtually an everyday event for West Sider," and it was featured in a section entitled, "About the town." The record does not reveal any further information regarding the context or placement of the article in the newspaper. Plaintiff's complaint specified 13 allegedly libelous remarks in the article. The first one was the title.

The article then began by stating, "It is shocking to discover how often Sampath Kumaran has been wronged." The article stated that Peoples Gas had shut off his heat, that Illinois Bell had " 'wantonly' " given him a defective telephone line, that the city had overbilled him for water, that Kuwait Airways had bumped him from a flight, that Air India had lost his luggage, that employers had fired him as a security guard because he is an East Indian, and that the State of Illinois had denied him unemployment benefits while he was between jobs as a substitute teacher. The article then stated, "Sampath Kumaran has suffered," and it cited damages allegedly caused by the airline bumping and the defective telephone line, including " 'mental torture' " and the loss of his job.

The article went on to state, "Sampath Kumaran has sued. Frequently." According to the article, plaintiff had filed "at least 24 lawsuits" since 1980, including a lawsuit initially seeking $1 million against Peoples Gas, and lawsuits against Illinois Bell, the City of Chicago, Kuwait Airways, and Air India, for the above claims. The article stated that some of the lawsuits had been dismissed, but that many had been settled, "which several lawyers believe is Kumaran's intention." (This is the second remark which plaintiff claimed was libelous.) The article then quoted defendants Roche and Kochanowski as follows:

" 'This guy's just working a scam,' said James J. Roche, who represented Andy Frain Security Co., which Kumaran claimed discriminated against him by firing him. [This is the third remark which plaintiff claimed was libelous.]

'Basically, he's figured out the system, that it's cheaper to settle than to try a case,' said Andrew Kochanowski, the attorney who represented Kuwait Airways. [This is the fourth remark that plaintiff claimed was libelous.]

The airline, which said Kumaran was not on the flight he desired because he left the departure gate and did not return until after [the] plane left, paid Kumaran $2,000 to settle his claim.

'He told the court he works 50 days a year as a substitute schoolteacher,' Kochanowski said. 'The rest of the time he

spends in court. This is his full-time profession.' " (This is the fifth remark that plaintiff claimed was libelous.)

The article went on to describe the exterior of plaintiff's residence and the signs in his windows asking passersby not to smoke, litter, play radios, or make noise. The article then stated:

"According to documents he has filed, Kumaran has recently worked as a substitute teacher in Berwyn's Morton High School District 201. The district reports that Kumaran's status is, predictably, in litigation. [This is the sixth remark that plaintiff claimed was libelous.]

Kumaran declined to be interviewed. He did, however, say of the notion that he files unwarranted suits for settlement money, 'That is the wrong impression.'

He also threatened to sue."

The article went on to quote Kochanowski, who admired plaintiff for being organized and for studying at the law library; and William Lazarus, who represented Air India and who described plaintiff as "fairly likeable," "very persistent," and "very flowery" in his correspondence. Lazarus was quoted as stating, " 'In his correspondence he was saying, "I don't want to sue Mother India. I would be happy to settle for a mere $20,000." ' "

The article then quoted Roche as stating that plaintiff knew more about civil rights law than Roche did. The article reported that Roche said Andy Frain had fired plaintiff because plaintiff had "walked off a job, claiming that the temperature inside McCormick Place was too cold." (This is the seventh remark that plaintiff claimed was libelous.) The article stated that Roche knew plaintiff previously "had filed numerous similar suits," but that plaintiff was " 'taunting' " Roche because plaintiff knew evidence of those suits would be inadmissible in a jury trial. (The "taunting" remark is the eighth remark that plaintiff claimed was libelous.) According to the article, Roche recalled that during the lawsuit, plaintiff had "accused two federal court judges of racism, including Senior U.S. District Court Judge James Parsons, the first black federal judge appointed since Reconstruction." (This is the ninth remark that plaintiff claimed was libelous.) The article then quoted Roche as follows:

" 'Federal judges bend over backwards for people with civil rights cases,' Roche said. Then you see an eight-ball like this guy take advantage of it, and it really irritates you.' " (This is the tenth remark that plaintiff claimed was libelous.)

The article then reported that judges who "accepted his [plaintiff's] claim that he has no money and deserves representation" had

appointed "some of the finest law firms in Chicago" to represent plaintiff for free, including William Snapp of Jenner and Block, and Richard Phelan, who "turned the cases over to more junior attorneys in their firms." (This is the eleventh remark that plaintiff claimed was libelous.) The article then stated:

> "Snapp does not recall the Kumaran case. But he said lawyers, especially those appointed to represent the poor, should not assume a case is frivolous or has no factual basis even if the plaintiff is a frequent suit filer.
>
> 'Even paranoids have enemies,' he said. 'It's not our job to be judge.' " (This is the twelfth remark that plaintiff claimed was libelous.)

The article reported that Federal judges had refused to appoint free attorneys for plaintiff on at least five occasions. The article reported further that two attorneys who had been appointed to represent plaintiff in a case against the City Colleges of Chicago "withdrew rather than sign Kumaran's complaint. In it, Kumaran listed 144 teaching jobs he said he had applied for, and said it was due to discrimination that he had not gotten a single one."

The article stated that plaintiff had "left an indelible impression on many." The article concluded as follows:

> "Kochanowski will not soon forget the way he picked up his settlement check from the lawyer's office. [This is the thirteenth remark that plaintiff claimed was libelous.]
>
> 'He showed up with his wife dressed as a security guard,' he said. 'He said, "I have been advised that I will be attacked." '
>
> 'At settlement time, he brought his son in,' said Mary Patricia Benz of Phelan Pope & John, one of Kumaran's court-appointed attorneys. 'He told me his son's name was America the Illustrious. I'll never forget it.' "

In his complaint, plaintiff alleged that he was an American citizen and a person "of good name, fame, with international and national reputation as a professional with very high qualifications, experiences and merit." He alleged that defendants connived in the composition of the article, which contained "many lies" and was "knowingly written with reckless disregard." He alleged that Brotman "maliciously and wrongfully and with reckless disregard [for] the plaintiff's good name and fame" caused the Tribune to publish the article. As we noted previously, he listed 13 remarks from the article and alleged that they constituted "some of the lies." In connection with the ninth allegedly libelous remark (that he had accused Federal judges of racism), he alleged that Roche told him in the Federal court hallway, " 'You will not

get anything from Andy Frain. You will get shit.' " He alleged further that he informed the judge of Roche's remark and that the judge then reprimanded Roche for "his senseless and racist remarks." He then alleged as follows:

> "5. The Defendants caused the article of the Chicago Tribune Newspaper to be delivered to numerous people, boards of education, attorneys, employment agencies and the source of income of the plaintiff, and also inside the courtrooms when the courts were in session, and the selfsame libelous, defamatory document, with several lies, was read by all of said persons.
>
> 6. The defendants, in making the communication, intended it to mean that the plaintiff was a swindler, and a crook, and the persons to whom the defamatory matter was communicated as aforesaid understood the words to have that meaning.
>
> 7. The defamatory matter communicated as aforesaid did and was calculated to cause great injury to plaintiff's reputation in his capacity as an educator and a professional teacher."

He alleged that defendants "knew that the words were untrue" at the time of publication. He alleged further that the defamation had damaged his credit and reputation, and had caused the loss of over $1 million in earnings. Finally, he demanded $6 million in "general" and punitive damages, plus court costs.

The Tribune and Brotman filed a motion to dismiss, contending that the article was not defamatory because it consisted of constitutionally protected opinion and was capable of an innocent construction. They contended further that plaintiff had failed to state a cause of action for defamation because he had "made himself a limited public figure" by virtue of his allegation that he had an international and national reputation and by virtue of his frequent recourse to the courts. They contended that he had failed to plead the requisite actual malice for a defamation claim by a public figure. Finally, they contended that the article was not defamatory *per se* because it did not impugn plaintiff's ability as a teacher.

In his response to the above motion to dismiss, plaintiff denied that he was a public figure and he stated that the article was defamatory *per se* and an invasion of privacy. He stated further that the purpose of the article was to ridicule him, deprive him of his livelihood, and pressure him to leave the country. Finally, he stated that the article incited public hatred and caused the loss of employment opportunities.

Kochanowski and Roche filed separate motions to dismiss, raising contentions similar to the ones raised by the motion of the media

defendants. Roche's motion discussed his remarks about plaintiff's knowledge of civil rights law and plaintiff as an "eight-ball," but failed to discuss his remark that plaintiff was "just working a scam."

In response, plaintiff reiterated that he was not a public figure and that he had an actionable claim for defamation. He contended that he also had actionable claims for all four common law privacy torts.

Among the other materials filed with the circuit court were two 1986 documents concerning plaintiff's teaching abilities and prospects. One was a "professional evaluation" of plaintiff's substitute teaching performance at New Trier High School in Winnetka, Illinois. In the evaluation, James Marran, the chairman of the social studies department at New Trier, stated that plaintiff had worked at New Trier as a substitute teacher for several years, and he described plaintiff as loyal and competent. Marran stated further that colleagues always had found plaintiff to be "congenial and cooperative" and that students had found him to be "an interesting and well prepared teacher." According to Marran, plaintiff had handled a recent assignment with "his usual grace and demeanor and performed splendidly," and he was "conscientious, straightforward and keenly perceptive," and "a man of immense charm, poise and versatility" with "impressive" credentials. He stated that he had not conducted a formal evaluation of plaintiff's work, but he concluded by stating that plaintiff's "special skills deserved to be recognized through placement in a permanent teaching situation."

In the other document, a letter "to whom it may concern," Donald L. Whited, a co-director of the evening program for Morton High School in Berwyn, Illinois, stated that plaintiff had taught evening classes for several semesters and had worked as a substitute teacher at Morton High School during the day for several years. He stated that he understood plaintiff previously had taught in Ohio, Canada, Ethiopia, and India. He was "very happy" with plaintiff's night school instruction. According to Whited, plaintiff was a "very enthusiastic" and "well prepared teacher," and Whited planned to keep him on the staff of evening school instructors.

In its written order granting defendants' motions to dismiss, the trial court observed that the article was not defamatory *per se* because it neither implied criminal conduct nor impugned plaintiff's integrity or ability as a teacher. The trial court observed further that the subject of the article—plaintiff's use of the courts—was a matter of public concern and entitled to full constitutional protection. In the trial court's opinion, the remarks in the article such as eight-ball,

paranoid, and scam were nonactionable rhetorical hyperbole. Finally, the trial court observed that plaintiff could not evade the defamation defenses by styling the action as a privacy tort.

During a hearing on plaintiff's motion for reconsideration, plaintiff orally informed the trial court that defendants had "systematically mailed" copies of the article to boards of education, attorneys, employment agencies, and security companies. According to plaintiff, numerous boards of education that previously had given him assignments had completely stopped doing so. In denying plaintiff's motion for reconsideration, the trial court refused to allow plaintiff leave to amend his complaint, and plaintiff has appealed. In response, defendants contend that the article was not defamatory *per se* because it neither imputed the commission of a criminal offense nor impugned plaintiff's teaching ability or integrity. They contend further that the article was not actionable because it consisted of constitutionally protected opinion and rhetorical hyperbole and was capable of an innocent construction. They also contend that plaintiff is a public figure, that the article addressed a matter of public concern, and that plaintiff failed to plead the requisite actual malice for a defamation action by a public figure or involving a matter of public concern. Finally, they contend that the article was a privileged account of judicial proceedings and that it is not actionable under any of the four common law privacy torts.

In reviewing the trial court's dismissal of the action without leave to amend, we must treat as true all well-pleaded facts and inferences. (*Fellhauer v. City of Geneva* (1991), 142 Ill. 2d 495, 499, 568 N.E.2d 870, 872.)

> "[A]ll well-pleaded facts in the challenged portions of the complaint are to be taken as true and a reviewing court must determine whether the allegations of the complaint, when interpreted in the light most favorable to the plaintiff, are sufficient to set forth a cause of action upon which relief may be granted." (*Di Benedetto v. Flora Township* (1992), 153 Ill. 2d 66, 69-70, 605 N.E.2d 571, 573.)

Pleadings are to be construed liberally. (*M G D, Inc. v. Dalen Trading Co.* (1992), 230 Ill. App. 3d 916, 919, 596 N.E.2d 15, 17.) A motion to dismiss should not be sustained "unless it clearly appears that no set of facts could be proven under the pleadings which would entitle the plaintiff to relief." (*Lovgren v. Citizens First National Bank* (1989), 126 Ill. 2d 411, 419, 534 N.E.2d 987, 990.) Whether to allow the plaintiff to amend his complaint is within the discretion of the trial court, and the test to determine whether the trial court properly exercised

its discretion is "whether allowance of the amendment furthers the ends of justice." (*Ray Dancer, Inc. v. D M C Corp.* (1992), 230 Ill. App. 3d 40, 48, 594 N.E.2d 1344, 1349.) We believe that the ends of justice require that plaintiff be allowed to amend his complaint to plead causes of action for defamation, tortious interference with prospective economic advantage, and false-light invasion of privacy.

DEFAMATION

> "In Illinois, a statement is considered defamatory if it impeaches a person's integrity, human decency, respect for others or reputation and thereby lowers that person in the eyes of the community [citation], as the gravamen of an action for defamation is damage to the plaintiff's reputation in the eyes of other persons." (*Rosner v. Field Enterprises, Inc.* (1990), 205 Ill. App. 3d 769, 789, 564 N.E.2d 131, 142-43.)

Words are defamatory *per se* if they, *inter alia*, impute the commission of a criminal offense or prejudice a party in his trade, profession or business. (*Mittelman*, 135 Ill. 2d at 238-39, 552 N.E.2d at 982; *Rosner*, 205 Ill. App. 3d at 790, 564 N.E.2d at 143; *Harte v. Chicago Council of Lawyers* (1991), 220 Ill. App. 3d 255, 260, 581 N.E.2d 275, 278.) Defamation *per se* is considered so obviously damaging that damages are presumed and the plaintiff is not required to show special damages. (*Rosner*, 205 Ill. App. 3d at 789-90, 564 N.E.2d at 143; *Harte*, 220 Ill. App. 3d at 259-60, 581 N.E.2d at 278.) In contrast, words are defamatory *per quod* if they require extrinsic facts or innuendo to explain their defamatory meaning, in which case the plaintiff must plead and prove special damages. *Mittelman*, 135 Ill. 2d at 233, 552 N.E.2d at 979; *Rosner*, 205 Ill. App. 3d at 790, 564 N.E.2d at 143; *Harte*, 220 Ill. App. 3d at 260, 581 N.E.2d at 278.

■■ In this case, we believe that plaintiff can plead a cause of action for defamation *per se* based upon the Tribune article. In analyzing this matter, we will focus upon the article's explicit remarks that plaintiff was "working a scam" by filing numerous lawsuits to extract monetary settlements on a full-time basis.

The word "scam" has been defined as "[a] fraudulent business scheme; swindle" (American Heritage Dictionary 1095 (2d College ed. 1985)) and as the same as a "confidence game," *i.e.*, "a swindle effected by gaining the confidence of the victim" (Webster's New World Dictionary 297 (2d College ed. 1982)). The verb "scam" has been defined as "to cheat or swindle, as in a confidence game." Webster's New World Dictionary 1270 (2d College ed. 1982).

In *Kolegas v. Heftel Broadcasting Corp.* (1991), 217 Ill. App. 3d 803, 807, 578 N.E.2d 299, 303, *appeal allowed* (1992), 143 Ill. 2d 639, 587 N.E.2d 1016, *aff'd in part & rev'd in part & cause remanded* (1992), 154 Ill. 2d 1, 607 N.E.2d 201, which none of the parties cited, it was held that the word "scamming" could be found to be defamatory *per se*. There, the appellate court reversed the dismissal of a defamation action against radio broadcasters who announced that the plaintiff, whose wife and son had neurofibromatosis and who was promoting a cartoon festival to benefit persons afflicted with neurofibromatosis, was "scamming" them.

On December 4, 1992, the Illinois Supreme Court affirmed the decision of the appellate court that the word "scamming" could be found to be defamatory *per se* because it imputed a lack of integrity in the discharge of employment duties and prejudiced the plaintiff in his business by implying that he was lying and trying to deceive people. The court also rejected the defendants' contentions that there was a reasonable innocent construction for the statement, that it was a constitutionally protected opinion and that it was nonactionable rhetorical hyperbole. (*Kolegas v. Heftel Broadcasting Corp.* (1992), 154 Ill. 2d 1, 12-16, 607 N.E.2d 201, 207-09.) We believe that *Kolegas* is dispositive of several issues in the case at bar.

■ In the case at bar, the clear import of the Tribune article, in its own words, was that plaintiff's full-time occupation was the filing of "unwarranted suits for settlement money," *i.e.*, that he was engaged in "scamming"—cheating or swindling—the courts and his legal adversaries. The article could be found to be defamatory because it impeached plaintiff's integrity and reputation. It could be found to be defamatory *per se* because it could be found to have imputed that he had committed a crime, and also because it could be found to have prejudiced him in his profession or trade as a schoolteacher.

With respect to the commission of a crime, section 17—1 of the Criminal Code of 1961 provides in part as follows:

"A person commits a deceptive practice when, with intent to defraud:

(a) He causes another, by deception or threat to execute a document disposing of property or a document by which a pecuniary obligation is incurred." (Ill. Rev. Stat. 1991, ch. 38, par. 17—1(B)(a) (now 720 ILCS 5/17—1(B)(a) (West 1992)).)

The commission of the above type of deceptive practice is a Class A misdemeanor (Ill. Rev. Stat. 1991, ch. 38, par. 17—1(B) (now 720 ILCS 5/17—1(B) (West 1992))), punishable by a term of imprisonment less than one year. (Ill. Rev. Stat. 1991, ch. 38, 1005—8—3(a)(1) (now

730 ILCS 515—8—3(a)(1) (West 1992)).) When the Tribune article is given its natural and obvious meaning, its clear import could be understood to be that plaintiff had filed numerous lawsuits as part of a fraudulent scheme or deceptive practice to procure pecuniary settlements. We therefore believe that the article could be found to be defamatory *per se* because it could be understood to have imputed the commission of a deceptive practice under section 17—1(B)(a) of the Criminal Code. See also *Rosner*, 205 Ill. App. 3d at 807, 564 N.E.2d at 154 ("The Accident Swindlers" headline and description of a fraudulent scheme imputed podiatrist's involvement in the commission of a crime).

We also believe that the article could be found to be defamatory *per se* because it could be understood to have prejudiced plaintiff as a schoolteacher. The portrayal of his full-time occupation as the filing of numerous "scam" lawsuits could tend to prejudice him in his trade as a teacher because a teacher would be expected to set a good example and function as a role model for his young, impressionable students. By portraying plaintiff as a swindler, the article could be found to prejudice his teaching ability and integrity because it presented him as someone who would not be an acceptable role model for young students.

We have concluded that the article could be found to be defamatory *per se* because it could be understood to impute plaintiff's commission of a criminally deceptive practice, and because it could be found to prejudice him in his capacity as a schoolteacher by maligning his ability to serve as a role model for his pupils. Whether it was actionable, however, depends upon a number of other considerations.

■ First, we do not believe that the article was reasonably susceptible of an innocent construction.

> "The gist of the innocent construction rule is that the statement is to be construed in the context it is published in, and that words should be given their natural and obvious meanings." (*Harte*, 220 Ill. App. 3d at 262, 581 N.E.2d at 279.)

The test is not whether the words reasonably can be innocently interpreted, but rather "whether the words, considered in context and given their natural and obvious meaning, may reasonably be innocently interpreted." *Rosner*, 205 Ill. App. 3d at 805-06, 564 N.E.2d at 153.

We reject defendants' contention that the Tribune article may reasonably be innocently interpreted. Instead, when given its natural and obvious meaning, the article implied that plaintiff had defrauded the courts and his legal adversaries by filing numerous unwarranted law-

suits to extract monetary settlements. See *Kolegas*, 154 Ill. 2d at 10-14, 607 N.E.2d at 206-08.

■ Nor do we believe that the rules regarding opinion and rhetorical hyperbole warranted dismissal of plaintiff's suit with prejudice. In *Milkovich v. Lorain Journal Co.* (1990), 497 U.S. 1, 21, 111 L. Ed. 2d 1, 19, 110 S. Ct. 2695, 2707, the Supreme Court refused to recognize a separate constitutional privilege for expressions of opinion. The Court observed that the true meaning of the word "opinion," for purposes of defamation, is "idea," that there is no "wholesale defamation exemption for anything that might be labeled 'opinion,'" and that "expressions of 'opinion' may often imply an assertion of objective fact." (*Milkovich*, 497 U.S. at 18, 111 L. Ed. 2d at 17, 110 S. Ct. at 2705.) Rhetorical hyperbole is not actionable as defamation because it cannot reasonably be construed as stating a fact about the plaintiff. *Milkovich*, 497 U.S. at 20, 111 L. Ed. 2d at 19, 110 S. Ct. at 2706.

In determining whether a statement is one of fact or opinion, a court should consider the totality of the circumstances and whether the statement can be objectively verified as true or false. (*Piersall v. SportsVision* (1992), 230 Ill. App. 3d 503, 510, 595 N.E.2d 103, 107.) A statement of fact usually concerns the plaintiff's conduct or character. (*Mittelman*, 135 Ill. 2d at 241, 552 N.E.2d at 983.) The court may additionally consider whether the statement "has a precise core of meaning for which a consensus of understanding exists, or conversely, whether the statement is indefinite and ambiguous," whether the "literary context of the statement would influence the average reader's readiness to infer that a particular statement has factual content," and whether the "broader social context or setting in which the statement appears signals a usage as either fact or opinion." *Mittelman*, 135 Ill. 2d at 243, 552 N.E.2d at 984.

■ Here, the gist of the article suggested that it was factual. The gist of the article—that plaintiff was "working a scam" by filing frequent, unwarranted lawsuits to procure pecuniary settlements—concerned plaintiff's conduct and his character, which suggests that it was factual. (See *Mittelman*, 135 Ill. 2d at 241, 552 N.E.2d at 983.) Furthermore, the word "scam" has a precise core of meaning for which a consensus of understanding exists, namely, swindle, and it is verifiable by reviewing the evidence in plaintiff's cases to discern whether the cases were *bona fide* or bogus. The literary context of the "scam" remark would cause the average reader to infer that plaintiff's lawsuits, especially the ones highlighted in the article against Peoples Gas, Illinois Bell, Kuwait Airways, Air India, and other defendants named in the article, were unwarranted or bogus.

Although certain remarks in the article may constitute rhetorical hyperbole (for example, "eight-ball"), the "scam" remark and the essence of the article could be found to be libelous *per se*, and we therefore reject defendants' contention that the article merely expressed nonactionable opinion or rhetorical hyperbole. See *Kolegas*, 154 Ill. 2d at 15-16, 607 N.E.2d at 208-09.

The next issue concerns the status of the parties and the standard of liability. We observed earlier that this case involves media defendants and nonmedia defendants. In *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 279-80, 11 L. Ed. 2d 686, 706, 84 S. Ct. 710, 726, the Supreme Court held that a public official who sued a media defendant for defamation had to show "that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." There is no contention in the case at bar that plaintiff was a public official. However, public figures are subject to the same actual malice standard as public officials. (See *Rosner*, 205 Ill. App. 3d at 782, 564 N.E.2d at 138.) The media defendants contend that plaintiff was a public figure because he alleged in his complaint that he was nationally and internationally renowned. They contend further that the complaint was properly dismissed because plaintiff failed to allege the requisite actual malice for a defamation action filed by a public figure against a media defendant. They also contend that an allegation of actual malice was required because the article addressed a matter of public concern, namely, plaintiff's use of the courts. The first question is whether plaintiff was a public figure.

■■■ Public schoolteachers have been held to be public figures because they are public employees, are paid with public funds, and hold highly responsible positions in the community. (*Basarich v. Rodeghero* (1974), 24 Ill. App. 3d 889, 892-93, 321 N.E.2d 739, 742.) In our view, *Basarich* sweeps too broadly. In *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 351, 41 L. Ed. 2d 789, 812, 94 S. Ct. 2997, 3013, the Supreme Court defined two alternative classes of public figures:

> "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions."

(See also *Rosner*, 205 Ill. App. 3d at 782, 564 N.E.2d at 138.) The Court continued:

"Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." (*Gertz*, 418 U.S. at 352, 41 L. Ed. 2d at 812, 94 S. Ct. at 3013.)

By way of illustration, presidential candidate Ross Perot and basketball player Michael Jordan arguably may have achieved such pervasive fame as to have become public figures for all purposes, while Dr. Jack Kervorkian· arguably may have voluntarily placed himself into the public controversy over euthanasia and physician-assisted suicide so as to have become a public figure for a limited range of issues. By way of contrast in the case at bar, plaintiff did not fall into either category of public figure. He was simply a substitute teacher. We therefore deem plaintiff to have been a private person. As a private person, he was not required to plead and prove actual malice by the media defendants and was only required to plead and prove negligence to recover actual, *i.e.*, compensatory damages. (*Gertz*, 418 U.S. at 347-50, 41 L. Ed. 2d at 809-11, 94 S. Ct. at 3010-12.) However, unless plaintiff pleads and proves facts showing actual malice, he cannot recover punitive damages. (See *Gertz*, 418 U.S. at 349-50, 41 L. Ed. 2d at 810-11, 94 S. Ct. at 3011-12; *Rosner*, 205 Ill. App. 3d at 784, 564 N.E.2d at 139.) As we previously observed, actual malice consists of defendants' knowledge that the statements in the article were false or their reckless disregard for the truth or falsity of the statements. Some of the *pro se* materials that plaintiff filed with the trial court contained accusations that defendants, or some of them, harbored racial animus or hatred for plaintiff and caused the article to be published as a means of pressuring him to leave this country and return to India. Given these circumstances, we believe that plaintiff should be allowed an opportunity to amend his complaint to plead facts, if he can, showing that defendants acted with actual malice, *i.e.*, knowledge that the article was false or reckless disregard for its truth or falsity, because actual malice is a prerequisite to his recovery of punitive damages.

■ Furthermore, we reject defendants' assertion that the article concerned a matter of public interest, *i.e.*, plaintiff's use of the courts, requiring that he allege actual malice even to recover compensatory damages. We have rejected the public interest or concern test for constitutional protection, because any newspaper article arguably is one

of public interest and such a test consequently is meaningless. *Rosner*, 205 Ill. App. 3d at 801-02, 564 N.E.2d at 150-51.

Moreover, we also reject defendants' contention that the article was a privileged report on judicial proceedings. Under the common law privilege to report on judicial proceedings:

> "[A] communication reporting the contents of a judicial proceeding is privileged, although it contains defamatory statements, if it is (a) accurate and complete as a fair summary of such proceedings, and (b) not made solely for the purpose of causing harm to the person defamed." (*Newell v. Field Enterprises, Inc.* (1980), 91 Ill. App. 3d 735, 744, 415 N.E.2d 434, 443.)

The article here was not a complete, fair summary of judicial proceedings. There was no review of any testimony in plaintiff's cases, nor any other evidence, discovery, arguments of counsel, judges' findings or terms of settlements. Rather, the article presented only isolated bits and pieces of information about plaintiff and his cases in such a manner as to portray him not only as eccentric and bizarre, but also as a swindler. Under these circumstances, the article was not protected by a common law privilege. *Cf. Nagib v. News-Sun* (1978), 64 Ill. App. 3d 752, 757, 381 N.E.2d 1014, 1018 (newspaper article was privileged where it reviewed the testimony, the arguments of counsel, and the judicial findings in the plaintiff's trial challenging his dismissal by a hospital).

TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Next, although the parties have not raised this issue, we believe that plaintiff should be allowed to amend his complaint to plead a cause of action for tortious interference with prospective economic advantage or business expectancy.

> "[T]o prevail on a claim for tortious interference with a prospective economic advantage, a plaintiff must prove: (1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference." (*Fellhauer*, 142 Ill. 2d at 511, 568 N.E.2d at 878.)

The plaintiff is required to plead facts suggesting that the defendant acted with the intent or purpose of interfering with his business expectancies. (*J. Eck & Sons, Inc. v. Reuben H. Donnelley Corp.* (1991),

213 Ill. App. 3d 510, 515, 572 N.E.2d 1090, 1093.) Furthermore, the plaintiff must allege business relationships with specific third parties. *Du Page Aviation Corp., Flight Services, Inc. v. Du Page Airport Authority* (1992), 229 Ill. App. 3d 793, 803, 594 N.E.2d 1334, 1340.

■ In this case, the record discloses that approximately three years prior to publication of the article, plaintiff was a substitute teacher in good standing at two suburban high schools, New Trier and Morton. His complaint alleged that defendants had "caused the article *** to be delivered to numerous people, boards of education, attorneys, employment agencies and the source of income of the plaintiff." He has accused defendants of pressuring him into leaving the country, and during the hearing on his motion for reconsideration, he orally informed the trial court that defendants had "systematically mailed" copies of the article to boards of education, employment agencies, attorneys, and security companies, that numerous boards of education had stopped supplying him with teaching assignments and that attorneys had refused to represent him. There was a strong implication that defendants' distribution of the article was designed to interfere with his business relationships to induce him to leave the country, and that defendants' distribution of the article was the reason for his loss of teaching assignments and legal counsel. He may have had a legitimate expectancy in an employment relationship with certain schools, boards of education, or others, with which defendants may have interfered, but as a *pro se* litigant, he may not have understood that such a separate tort exists. Given the circumstances, we believe that he deserves an opportunity to amend his complaint to allege facts showing that defendants tortiously interfered with his prospective economic advantage or business expectancies with specific prospective employers.

INVASION OF PRIVACY

■ Finally, we believe that plaintiff should be allowed to amend his complaint to plead facts, if he can, setting forth the false-light invasion of privacy tort, which he raised in several briefs filed with the trial court. In reaching this conclusion, we are accepting as true, as we must in reviewing the dismissal of plaintiff's complaint, the allegation in the complaint that "defendants knew that the words were untrue." In pleading that the publicity was an invasion of his privacy, plaintiff should bear in mind that to state a cause of action for false-light invasion of privacy, which is closely related to defamation, he must plead facts suggesting that the article placed him in a false light, that the false light would have been highly offensive to a rea-

sonable person, and that defendants had actual malice. (See *Kolegas*, 154 Ill. 2d at 17, 607 N.E.2d at 209; *Lovgren*, 126 Ill. 2d at 418-23, 534 N.E.2d at 989-92.) He should also bear in mind that "minor mistakes in reporting, even if made deliberately, or false facts that offend a hypersensitive individual will not satisfy this element." *Lovgren*, 126 Ill. 2d at 420, 534 N.E.2d at 990.

. Finally, we discern no basis in the record for plaintiff to plead the other three privacy torts, *i.e.*, intrusion upon his seclusion or solitude, public disclosure of private embarrassing facts about him, or commercial appropriation of his name or likeness. See generally *Melvin v. Burling* (1986), 141 Ill. App. 3d 786, 787, 490 N.E.2d 1011, 1012.

To summarize, we believe that plaintiff deserves an opportunity to amend his complaint to plead facts supporting causes of action for defamation, intentional interference with prospective economic advantage, and false-light invasion of privacy. As a private person rather than a public figure, he is not required to allege that defendants acted with actual malice. To recover compensatory damages, he need only allege that they acted negligently. However, if he fails to allege facts suggesting that they acted with actual malice, *i.e.*, with knowledge that the article was false or with reckless disregard for its truth or falsity, he will not be able to recover punitive damages, and he will not be permitted to proceed with the false-light invasion of privacy claim.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the matter is remanded for further proceedings consistent with this order.

Reversed and remanded.

MANNING, P.J., and CAMPBELL, J., concur.